STATE OF NORTH CAROLINA v. LEVAR JAMEL ALLEN

No. 485PA04

(Filed 1 July 2005)

### 1. Appeal and Error— general supervisory authority—review of Court of Appeals' decision on motion for appropriate relief

The Supreme Court exercised its general supervisory authority and accepted the State's petition for discretionary review of a Court of Appeals decision resolving a motion for appropriate relief in the Court of Appeals, despite N.C.G.S. § 15A-1422(f), because a prompt and definitive resolution of the constitutionality of North Carolina Structured Sentencing Act was necessary to the fair and effective administration of North Carolina's criminal courts.

### 2. Sentencing— structured—facts increasing punishment—jury finding beyond a reasonable doubt—indictment allegation not required

Applied to North Carolina's structured sentencing scheme, the rule of *Apprendi v. New Jersey*, 530 U.S. 466, and *Blakely v. Washington*, 542 U.S. 296, is that any fact other than a prior conviction that increases the penalty beyond the presumptive range must be submitted to a jury and proved beyond a reasonable doubt. The language of *State v. Lucas*, 353 N.C. 568, which defines "statutory maximum" in a manner inconsistent with this opinion is overruled, along with language requiring sentencing factors which might lead to a sentencing enhancement to be alleged in an indictment.

### 3. Sentencing— aggravating factors—jury finding beyond a reasonable doubt

The Sixth Amendment of the U.S. Constitution is violated by those portions of N.C.G.S. § 15A-1340.16(a), (b), and (c) which require trial judges to consider evidence of aggravating factors not found by a jury or admitted by the defendant and which permit imposition of an aggravated sentence upon judicial findings of such aggravating factors by a preponderance of the evidence. However, this ruling affects only those portions of the Structured Sentencing Act which require the sentencing judge to consider aggravating factors not admitted by defendant or found by a jury;

those portions of N.C.G.S. § 15A-1340.16 which govern a sentencing judge's finding of mitigating factors and which permit the judge to balance aggravating factors otherwise found to exist are not implicated and remain unaffected.

### 4. Sentencing— *Blakely* errors—structural—reversible *per se*

*Blakely v. Washington* errors arising under North Carolina's Structured Sentencing Act are structural and therefore reversible *per se.* The harmless error rule does not apply because the jury's findings have been vitiated in total. This holding applies to cases in which the defendants have not been indicted as of the certification date of this opinion and to cases that are now pending on direct review or are not yet final.

Justice MARTIN concurring in part and dissenting in part.

Chief Justice LAKE and Justice NEWBY join in the concurring and dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 166 N.C. App. 139, 601 S.E.2d 299 (2004), finding no error in trial but remanding for resentencing after consideration of defendant's motion for appropriate relief from a judgment entered 31 January 2003 by Judge J. Gentry Caudill in Superior Court, Gaston County. On 8 February 2005, defendant filed a motion for appropriate relief in this Court. Heard in the Supreme Court 15 March 2005.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State-appellant.*

*Richard E. Jester for defendant-appellee.*

BRADY, Justice.

The primary question presented for review is whether sentencing errors which violate a defendant's Sixth Amendment right to jury trial pursuant to the recent United States Supreme Court decision in *Blakely v. Washington,* 542 U.S. 296, 159 L. Ed. 2d 403 (2004), may be deemed harmless. We conclude that *Blakely* errors are structural and modify and affirm the decision of the Court of Appeals remanding defendant's case to Gaston County Superior Court for resentencing.

Preliminarily, this Court must also examine the effect of *Blakely* on criminal sentencing in North Carolina. We conclude that *Blakely*

STATE v. ALLEN

[359 N.C. 425 (2005)]

applies to North Carolina's Structured Sentencing Act and that N.C.G.S. § 15A-1340.16, which is a part of that Act, violates the Sixth Amendment as interpreted in *Blakely*.

These holdings apply to cases "in which the defendants have not been indicted as of the certification date of this opinion and to cases that are now pending on direct review or are not yet final." *State v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712, 732 (2001). *See State v. Hinnant*, 351 N.C. 277, 523 S.E.2d 663 (2000); *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649 (1987).

## FACTUAL BACKGROUND

On 3 December 2001, defendant Levar Jamel Allen was indicted for child abuse inflicting serious bodily injury, a Class C felony. The indictment alleged that on 7 November 2001, defendant intentionally and severely burned his nine month old son, thereby causing serious injury to the child. Defendant pleaded not guilty to the offense and was tried by jury at the 28 January 2003 term of Gaston County Superior Court before Judge J. Gentry Caudill. On 31 January 2003, the jury unanimously found defendant guilty of felony child abuse inflicting serious bodily injury.

During the sentencing proceeding, Judge Caudill calculated that defendant had a prior record level of II, based upon one previous Class 1 misdemeanor conviction and one previous Class A1 misdemeanor conviction. Judge Caudill made additional findings of aggravating and mitigating factors. In aggravation, Judge Caudill found by a preponderance of the evidence that defendant's abuse of his son was especially heinous, atrocious, or cruel. In mitigation, Judge Caudill found three factors by a preponderance of the evidence: (1) "the defendant has been a person of good character or has had a good reputation in the community," (2) "the defendant has a support system in the community," and (3) "the defendant was punished emotionally." Judge Caudill determined that "factors in aggravation outweigh the factors in mitigation and that an aggravated sentence is justified." Finally, Judge Caudill imposed an aggravated sentence of 115 months minimum to 147 months maximum imprisonment. Defendant's maximum aggravated sentence is eighteen months longer than the maximum presumptive sentence permitted by statute for a Class C felony, prior record level II.

Defendant appealed to the North Carolina Court of Appeals, contesting, among other assignments of error, the sufficiency of evi-

dence supporting Judge Caudill's finding of the especially heinous, atrocious, or cruel aggravating factor. On 29 June 2004, while his direct appeal was pending in the Court of Appeals, defendant filed a motion for appropriate relief in that Court. In his motion, defendant argued that the Sixth Amendment to the United States Constitution required the especially heinous, atrocious, or cruel aggravating factor to be proved to a jury beyond a reasonable doubt. Because Judge Caudill found that aggravating factor by a preponderance of the evidence, defendant requested a new sentencing proceeding. In support of his motion, defendant cited the United States Supreme Court's decision in *Blakely v. Washington*, —— U.S. ——, 159 L. Ed. 2d 403 (2004), which applied the Court's earlier holding in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000), to invalidate Washington State's "exceptional" sentencing system. On 7 September 2004, a unanimous panel of the Court of Appeals issued an opinion finding no error in defendant's trial, but remanded defendant's case for resentencing pursuant to *Blakely* and this Court's 1983 decision in *State v. Ahearn*, 307 N.C. 584, 300 S.E.2d 689 (1983).

## PROCEDURAL POSTURE

**[1]** This matter is before the Court on the State's petition for discretionary review, allowed 23 September 2004. Defendant contends that this Court lacks subject matter jurisdiction to review the Court of Appeals' decision because he raised the question of *Blakely* error in the Court of Appeals by a motion for appropriate relief. In support of his argument, defendant cites N.C.G.S. § 15A-1422(f), which states that "[d]ecisions of the Court of Appeals on motions for appropriate relief that [are made more than ten days after entry of judgment] are final and not subject to further review by appeal, certification, writ, motion, or otherwise."

We agree that N.C.G.S. § 15A-1422(f) bars this Court's review of Court of Appeals' decisions on most motions for appropriate relief from noncapital judgments and convictions. *See State v. Barrett*, 307 N.C. 126, 302 S.E.2d 632 (1982) (dismissing the defendant's appeal of the Court of Appeals decision denying his motion for appropriate relief). This restriction has the desirable effect of imparting finality to post-conviction proceedings and freeing limited judicial resources for attention to cases on direct review, which involve capital or constitutional questions, and questions in dispute among the members of the Court of Appeals as reflected by a dissenting opinion. N.C.G.S. §§ 7A-27(a), 30 (2003). Collateral review of noncapital judg-

ments and convictions is, in general, not a core function of the Supreme Court of North Carolina.

However, collateral review is proper in certain rare circumstances, as when the Court of Appeals applies a new federal constitutional rule of widespread effect on the administration of justice throughout the state. *Cf. In re Brownlee*, 301 N.C. 532, 548, 272 S.E.2d 861, 870 (1981) ("Under exceptional circumstances this [C]ourt will exercise power under [Article IV, Section 12, Clause 1 of the North Carolina Constitution] in order to consider questions which are not presented according to our rules of procedure; and this [C]ourt will not hesitate to exercise its general supervisory authority when necessary to promote the expeditious administration of justice.") (citations omitted); *State v. Stanley*, 288 N.C. 19, 26, 215 S.E.2d 589, 594 (1975) ("This Court will not hesitate to exercise its rarely used general supervisory authority when necessary to promote the expeditious administration of justice. Under unusual and exceptional circumstances [the Court] will exercise this power to consider questions which are not properly presented according to [its] rules.") (citations omitted). Read broadly, the Court of Appeals' decision in *Allen*, applying *Blakely*, calls into question the constitutionality of North Carolina's Structured Sentencing Act and identifies a new type of structural error which is reversible *per se*. For these reasons *Allen* and *Blakely* have the potential to affect a significant number of criminal sentences in North Carolina.

Because a prompt and definitive resolution of this issue is necessary to ensure the continued fair and effective administration of North Carolina's criminal courts, we exercise the supervisory authority of this Court, which is embodied in Article IV, Section 12, Clause 1 of the North Carolina Constitution, and review the opinion of the Court of Appeals. In so doing, we note that N.C.G.S. § 15A-1422(f) cannot restrict this Court's constitutionally granted power to "issue any remedial writs necessary to give it general supervision and control over the proceedings of the other courts." N.C. Const. art. IV, § 12, cl. 1; *see also id.* art. IV, § 1 ("The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government . . . .").

For the reasons stated above, we determine that the State's petition for discretionary review of the decision of the Court of Appeals resolving defendant's motion for appropriate relief is properly before this Court. We now consider the effect of *Blakely v.*

**STATE v. ALLEN**

[359 N.C. 425 (2005)]

*Washington* on North Carolina's Structured Sentencing Act and the proper standard of review to be applied when *Blakely* error is identified in a defendant's case.

## NORTH CAROLINA STRUCTURED SENTENCING

In 1979 the North Carolina General Assembly enacted presumptive sentencing legislation, commonly known as the "Fair Sentencing Act," in "response to a perceived need for certainty in sentencing, to a perceived evil of disparate sentencing, and to a perceived problem in affording trial judges and parole authorities unbridled discretion in imposing sentences." *Ahearn*, 307 N.C. at 594, 300 S.E.2d at 695; An Act to Establish a Fair Sentencing System in North Carolina Criminal Courts, ch. 760, 1979 N.C. Sess. Laws 850. Before enactment of this legislation, North Carolina, like most other states, utilized "typical indeterminate sentencing law." Stevens H. Clarke, *Law of Sentencing, Probation and Parole in North Carolina* 39-40 (Inst. of Gov't, Univ. of N.C. at Chapel Hill 1991) [hereinafter, Clarke, *Sentencing*]. "Ranges of prison terms were wide for broadly defined crimes," and "[n]o criteria for sentencing were set by statute, court decision, or court rules." *Id.* at 40.

North Carolina's Fair Sentencing Act was revised several times before it went into effect on 1 July 1981. *See* N.C.G.S. § 15A-1340.1 (1995). The act stated that

> [t]he primary purposes of sentencing a person convicted of a crime are to impose a punishment commensurate with the injury the offense has caused, taking into account factors that may diminish or increase the offender's culpability; to protect the public by restraining offenders; to assist the offender toward rehabilitation and restoration to the community as a lawful citizen; and to provide a general deterrent to criminal behavior.

*Id.* § 15A-1340.3 (Supp. 1981).

In 1993 the General Assembly further reformed North Carolina's criminal sentencing system, enacting legislation commonly known as the "Structured Sentencing Act" in response to rising prison populations. Clarke, *Sentencing* 1-4 (Supp. 1994). Structured sentencing, which classifies convicted criminal defendants for sentencing purposes based upon the severity of their crime (offense class) and gravity of their prior criminal record (prior record level), became effective on 1 October 1994 and is still in effect today. An Act To Provide for Structured Sentencing in North Carolina Consistent with the

Standard Operating Capacity of the Department of Correction and Local Confinement Facilities and To Redefine State and County Responsibilities for the Confinement of Misdemeanants, ch. 538, 1993 N.C. Sess. Laws 2299-2313 (codified as amended at N.C.G.S. ch. 15A, art. 81B (2003) (effective date Oct. 1, 1994)). The Structured Sentencing Act repealed the Fair Sentencing Act and remedied many of the perceived weaknesses of that earlier legislation, including that the Fair Sentencing Act "applied only to felonies, did not control the sentence disposition (leaving judges free to impose probation unless forbidden by other statutes), and set only a presumptive prison/jail term." Clarke, *Sentencing* 9 (Supp. 1994). Repealing Chapter 15A, Article 85A of the North Carolina General Statutes, the Structured Sentencing Act abolished parole for certain convicted felons and ensured that new felony offenders serve their entire sentence. Ch. 538, sec. 24, 1993 N.C. Sess. Laws at 2341.

Pursuant to the Structured Sentencing Act, sentencing judges must impose both a minimum and maximum active, inter-mediate, or community punishment for felony convictions. N.C.G.S. § 15A-1340.13 (2003). Separate statutory punishment charts dictate a defendant's minimum and maximum sentence. *See id.* § 15A-1340.17 (2003). The length of term imposed depends upon the offense class, the defendant's prior record level, and the presence of aggra-vating or mitigating factors. *Id.* at §§ 15A-1340.13, -1340.14, -1340.16, -1340.17 (2003).

The statutory punishment chart for minimum sentences consists of a grid on which offense classes and prior record levels are the axes. *Id.* § 15A-1340.17(c).[1] Ranges of possible minimum sentences, which are set forth for every combination of offense class and prior record level, are either presumptive, as in a typical case; mitigated, as in less severe cases; or aggravated, as in the worst cases. *Id.* Maximum sentences corresponding to every possible minimum sen-tence are listed in separate tables.[2] *Id.* § 15A-1340.17(d), (e), (e1).

Before selecting a convicted criminal defendant's minimum sen-tence, the sentencing judge must consider whether aggravating and mitigating factors are present, weigh any existing factors, and decide upon a mitigated, presumptive, or aggravated punishment range. *Id.* § 15A-1340.16(a)-(c). The State carries the burden of proving by a preponderance of the evidence that an aggravating factor exists

1. See Figure 1; N.C.G.S. § 15A-1340.17(c).

2. See Figure 2; N.C.G.S. § 15A-1340.17(d), (e), (e1).

and the defendant carries a corresponding burden to prove that a mitigating factor exists. *Id.* § 15A-1340.16(a). Statutory aggravating and mitigating factors are enumerated in section 15A-1340.16(d) and (e); however, this list is not exclusive and both the prosecutor and defendant are entitled to present evidence of any other "factor reasonably related to the purposes of sentencing." *Id.* § 15A-1340.16(d)(20), (e)(21). The judge may impose an aggravated or mitigated sentence whenever he finds aggravating or mitigating factors to exist, but the decision to depart from the presumptive range is wholly within the trial court's discretion. *Id.* § 15A-1340.16 (a), (b).

## RIGHT TO JURY TRIAL

The right to jury trial is the only constitutional guarantee preserved both in the body of the Constitution and the Bill of Rights. U.S. Const. art. III, § 2, cl. 3; *id.* amend. VI; *Duncan v. Louisiana*, 391 U.S. 145, 152-53, 20 L. Ed. 2d 491, 498 (1968).[3] Article III, Section 2, Clause 3 of the United States Constitution states that "[t]he trial of all crimes, except in cases of impeachment, shall be by jury." The Sixth Amendment to the Constitution of the United States further provides that "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." As observed by Sir William Blackstone, the right to jury trial instills public trust in determinations of a defendant's guilt or innocence because "the truth of every accusation . . . [must] be confirmed by the unanimous suffrage of twelve of his equals and neighbours." 4 William Blackstone, *Commentaries* \*349-50, *quoted in Duncan*, 391 U.S. at 151-52, 20 L. Ed. 2d at 497, and *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 412 (alterations in original).

In 2000, however, the United States Supreme Court held that the right to jury trial also requires that jurors find *sentencing facts* which increase the penalty for a crime "beyond the prescribed statutory maximum." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455 (2000). Four years later, the Court defined "statutory maximum" as the maximum sentence permitted by the jury's verdict or

---

3. The right to jury trial, which has been classified as a "fundamental right" by the United States Supreme Court was also secured by the constitutions of the original thirteen states, including North Carolina, and the constitution of every state subsequently entering the Union. *Duncan*, 391 U.S. at 153, 157-58, 20 L. Ed. 2d at 498, 501. *See* N.C. Const. of 1776, A Declaration of Rights, § 9 (right of jury trial in criminal cases).

admitted by the defendant, without additional judge-made findings of fact. *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 413-14.

This Court must now determine whether North Carolina's Structured Sentencing Act is *Blakely* compliant. After thorough review of United States Supreme Court precedent, including *Apprendi v. New Jersey* and *Blakely v. Washington*, and this Court's intervening opinion in *State v. Lucas*, we conclude that those portions of N.C.G.S. § 15A-1340.16 which require trial judges to consider evidence of aggravating factors not found by a jury or admitted by the defendant and which permit imposition of an aggravated sentence upon judicial findings of such aggravating factors by a preponderance of the evidence are unconstitutional.

In *Apprendi v. New Jersey*, the United States Supreme Court granted certiorari to review a New Jersey law which authorized an "extended term" of imprisonment for defendants whose crimes were classified as "hate crimes." 530 U.S. at 468-69, 147 L. Ed. 2d at 442. This "hate crime" enhancement, which did not criminalize conduct in and of itself, was designed to augment the maximum sentence imposed for any separate complete offense. *Id.* Under the New Jersey statute, a trial judge was permitted to impose a longer sentence than the sentence set forth in the provision defining an underlying offense if the judge found by a preponderance of the evidence that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Id.*

The defendant in *Apprendi* pleaded guilty to second-degree possession of a firearm for an "unlawful purpose," an offense punishable in New Jersey by five to ten years imprisonment. *Id.* at 469-70, 147 L. Ed. 2d at 442-43. During sentencing, the State requested, and the trial judge conducted, an evidentiary hearing on the defendant's "purpose" for unlawful possession. *Id.* at 470, 147 L. Ed. 2d at 443. Following the hearing, the judge found by a preponderance of the evidence that the defendant's actions were " 'motivated by racial bias' " and committed " 'with a purpose to intimidate.' " *Id.* at 471, 147 L. Ed. 2d at 443. Thereafter, the judge sentenced the defendant to a twelve-year "extended term" of imprisonment. *Id.*

On appeal, the defendant argued that the Due Process Clause of the United States Constitution requires that findings of "bias" and "purpose to intimidate"—the two factors upon which his "extended term" was based—must be proved to a jury beyond a reasonable

doubt. *Id.* The United States Supreme Court agreed, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 147 L. Ed. 2d at 455. The Court concluded: "The New Jersey procedure challenged in this case is an *unacceptable departure from the jury tradition* that is an indispensable part of our criminal justice system." *Id.* at 497, 147 L. Ed. 2d at 459 (emphasis added). Granting relief to the defendant, the United States Supreme Court reversed the judgment of the Supreme Court of New Jersey and remanded the case for further proceedings not inconsistent with its opinion. *Id.*

The following year, in *State v. Lucas*, this Court applied *Apprendi* to the sentencing of a defendant whose first-degree burglary and second-degree kidnapping sentences were enhanced pursuant to N.C.G.S. § 15A-1340.16A, which required that sixty months be added to a defendant's minimum sentence upon a judicial finding that the defendant "used, displayed, or threatened to use or display a firearm." 353 N.C. at 592-93, 548 S.E.2d at 728. Section 15A-1340.16A applied to defendants convicted of Class A, B1, B2, C, D, or E felonies. *Id.* Like the New Jersey statute challenged in *Apprendi*, section 15A-1340.16A lengthened the actual sentence imposed for an underlying offense, but did not criminalize the conduct itself. *Id.* at 592-93, 548 S.E.2d at 728-29.

In *Lucas*, a jury convicted the defendant of first-degree burglary, a Class D felony, and second-degree kidnapping, a Class E felony. *Id.* at 593, 548 S.E.2d at 729. During sentencing, the trial court determined that the defendant had a prior record level of I. *Id.* Referring to the appropriate statutory punishment chart, the sentencing judge selected minimum sentences at the high end of the presumptive range: sixty-four months minimum imprisonment for first-degree burglary and twenty-five months minimum imprisonment for second-degree kidnapping. *Id.* Thereafter, the judge added sixty months to each minimum sentence in accordance with section 15A-1340.16A, before determining the corresponding maximum sentences. *Id.*

Reviewing the defendant's motion for appropriate relief, this Court considered the meaning of "statutory maximum" as employed by *Apprendi*. *Id.* at 596, 548 S.E.2d at 730-31. The Court defined "statutory maximum" for *Apprendi* purposes as the maximum sentence that a trial judge could properly impose by reference to the statutory punishment charts, including an aggravated sentence. *Id.* at 596, 548 S.E.2d at 731. The Court explained that the maximum

sentence authorized by the North Carolina Structured Sentencing Act results from:

> (1) findings that the defendant falls into the highest criminal history category for the applicable class offense *and that the offense was aggravated,* followed by (2) a decision by the sentencing court to impose the highest possible corresponding minimum sentence from the ranges presented in the chart found in N.C.G.S. § 15A-1340.17(c).

*Id.* (emphasis added).

This holding appeared consistent with *Apprendi,* in which, following a historical discussion of common law sentencing jurisprudence, the United States Supreme Court cautioned:

> We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence[s] *within statutory limits* in the individual case.

530 U.S. at 481, 147 L. Ed. 2d at 449.

Under the straightforward approach developed by *Lucas,* most criminal sentences in North Carolina were considered *Apprendi* compliant. In a small number of cases, as in *Lucas,* separate statutory enhancement provisions had the potential to increase a defendant's actual sentence beyond the statutory maximum.

As calculated in *Lucas,* the maximum enhanced sentence for a Class D felony pursuant to N.C.G.S. § 15A-1340.16A was 301 months—seventy-two months longer than the authorized statutory maximum sentence defined by this Court. 353 N.C. at 597, 548 S.E.2d at 731. Applying *Apprendi,* this Court held that facts supporting such an enhanced sentence under N.C.G.S. § 15A-1340.16A must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 597-98, 548 S.E.2d at 731. The Court further held that "in every instance where the State seeks an enhanced sentence pursuant to N.C.G.S. § 15A-1340.16A, it must allege the statutory factors supporting the enhancement in an indictment." *Id.* For the reasons stated above, this Court found that the State must "meet the requirements set out in . . . *Apprendi* in order to apply the enhancement provisions of

the statute."[4] *Id.* at 598, 548 S.E.2d at 732. Granting relief, the Court vacated the defendant's enhanced sentences and remanded his case to the trial court for further proceedings consistent with its opinion. *Id.* at 599, 548 S.E.2d at 732.

In *Blakely v. Washington*, the United States Supreme Court addressed the meaning of "statutory maximum" with respect to an "exceptional" sentence imposed on a criminal defendant pursuant to Washington State's Sentencing Reform Act. 542 U.S. at ——, ——, 159 L. Ed. 2d at 410, 413. The defendant pleaded guilty to second-degree kidnapping involving domestic violence and use of a firearm, an offense punishable by imprisonment within a "standard range" of forty-nine to fifty-three months under Washington state law. *Id.* at ——, 159 L. Ed. 2d at 410-11. Washington statutes provided, however, that a judge may impose a sentence above the "standard range" upon finding "substantial and compelling reasons justifying an exceptional sentence." *Id.* at ——, 159 L. Ed. 2d at 411. "Substantial and compelling reasons" deemed to support an exceptional sentence were listed in Washington's Sentencing Reform Act. *Id.* at ——, 159 L. Ed. 2d at 411. The trial judge found as an aggravating factor that defendant had acted with "deliberate cruelty" in kidnapping his wife. *Id.* at ——, 159 L. Ed. 2d at 411. The judge then sentenced the defendant to an exceptional sentence of ninety months—thirty-seven months longer than the maximum sentence recommended by prosecutors and authorized by Washington's kidnapping statute. *Id.* at ——, 159 L. Ed. 2d at 411.

On appeal, the defendant argued that Washington's Sentencing Reform Act, which permits judges to impose "exceptional sentences" based upon judicial findings of aggravating sentencing factors, "deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence." *Id.* at ——, 159 L. Ed. 2d at 412. The United States Supreme Court agreed, reaffirming the *Apprendi* rule. *Id.* at ——, 159 L. Ed. 2d

---

4. In 2003, the North Carolina General Assembly revised N.C.G.S. § 15A-1340.16A by An Act to Amend the Law Regarding Enhanced Sentences as Recommended by the Sentencing Commission and to Make Conforming Changes. Ch. 378, sec. 2, 2003 N.C. Sess. Laws 1078, 1078. Applicable to all offenses occurring on or after 1 August 2003, revised section 15A-1340.16A corrects the constitutional defect identified by this Court in *Lucas* and complies with this Court's holdings in that case. As amended, section 15A-1340.16A requires that facts supporting an enhanced sentence for firearm use be alleged in the indictment and proved to a jury beyond a reasonable doubt. Trial judges are no longer permitted to find facts supporting an enhanced sentence pursuant to section 15A-1340.16A.

at 412, 415-16. The Court further clarified that the "statutory maximum" referred to by *Apprendi* is not the maximum sentence authorized by statute, but "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Id.* at ——, 159 L. Ed. 2d at 413. The jury's verdict or the defendant's admissions, standing alone, must authorize the sentence imposed. *Id.* at ——, 159 L. Ed. 2d at 413-14.

Applying this definition to the defendant, the United States Supreme Court concluded that the ninety month "exceptional sentence" imposed under Washington's Sentencing Reform Act exceeded the "statutory maximum" by more than three years. *Id.* at ——, 159 L. Ed. 2d at 413-14, 420. Accordingly, the Court held that the Sixth Amendment required the facts supporting the defendant's "exceptional sentence," specifically that the defendant acted with "deliberate cruelty," to be proved to a jury beyond a reasonable doubt. *Id.* at ——, 159 L. Ed. 2d at 420. Granting the defendant relief, the United States Supreme Court reversed the judgment of the Washington Court of Appeals and remanded his case for further proceedings not inconsistent with its opinion. *Id.*

[2] The United States Supreme Court decision in *Blakely* and the North Carolina Court of Appeals decision in *Allen* prompt this Court to revisit its prior holding in *Lucas* defining "statutory maximum." After *Blakely*, it is clear that the "statutory maximum" to which *Apprendi* applies is not the maximum sentence authorized by statute; rather, for *Apprendi* purposes, "statutory maximum" means the maximum sentence authorized by the jury verdict or the defendant's admissions. Applied to North Carolina's structured sentencing scheme, the rule of *Apprendi* and *Blakely* is: Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed presumptive range must be submitted to a jury and proved beyond a reasonable doubt. *See Blakely,* —— U.S. at ——, 159 L. Ed. 2d at 413-14; *Apprendi,* 530 U.S. at 490, 147 L. Ed. 2d at 455; N.C.G.S. §§ 15A-1340.13, -15A-1340.14, -15A-1340.16; -15A-1340.17. Accordingly, we overrule that language of *State v. Lucas* which defines "statutory maximum" in a manner inconsistent with this opinion.

On 8 February 2005, defendant filed a motion for appropriate relief in this Court, arguing that "*Blakely* and the surviving portion of *Lucas*" require "aggravating factors that are used to increase a sentence beyond the top of the presumptive range . . . be alleged in an indictment." As indicated in *Lucas,* 353 N.C. at 597-98, 548 S.E.2d at

731, a requirement that the State "allege the statutory factors supporting the [N.C.G.S. § 15A-1340.16A] enhancement in an indictment" might be inferred from the United States Supreme Court's statement in *Apprendi* that

> 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' The Fourteenth Amendment commands the same answer in this case involving a state statute.

530 U.S. at 476, 147 L. Ed. 2d at 446 (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 326 n.6 (1999)).

However, in footnote three of the *Apprendi* opinion, the Court clarified that "[the defendant] has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. . . . We thus do not address the indictment question separately today." Subsequent United States Supreme Court decisions in *Ring v. Arizona* and *Blakely*, which applied *Apprendi* to aggravating factors supporting capital and noncapital sentences respectively, were based solely on the Sixth Amendment right to jury trial, without reference to the Fifth Amendment's indictment guarantee. *Ring v. Arizona*, 536 U.S. 584, 597, 609, 153 L. Ed. 2d 556, 569, 576-77 (2002); *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 415-16. Although "[d]ue process and notice requirements under the Sixth Amendment inure[] to state prosecutions," this Court recently recognized "to this date, the United States Supreme Court has not applied the Fifth Amendment indictment requirements to the states." *State v. Hunt*, 357 N.C. 257, 272-73, 582 S.E.2d 593, 603-04, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003). Indeed, in *Hunt* this Court concluded that "the Fifth Amendment would not require aggravators, even if they were fundamental equivalents of elements of an offense, to be pled in a state-court indictment." *Id.* at 272, 582 S.E.2d at 603. Accordingly, we also overrule that language of *Lucas*, requiring sentencing factors which might lead to a sentencing enhancement to be alleged in an indictment.

[3] For the reasons stated above, we determine that those portions of N.C.G.S. § 15A-1340.16 (a), (b), and (c) which require trial judges to consider evidence of aggravating factors not found by a jury

or admitted by the defendant and which permit imposition of an aggravated sentence upon judicial findings of such aggravating factors by a preponderance of the evidence violate the Sixth Amendment to the United States Constitution. Standing alone, N.C.G.S. § 15A-1340.16(d), which lists statutory aggravating factors, can be given effect as if the unconstitutional provisions had not been enacted. *See, e.g., Pope v. Easley*, 354 N.C. 544, 548, 556 S.E.2d 265, 268 (2001) ("The test for severability is whether the remaining portion of the legislation can stand on its own and whether the General Assembly would have enacted the remainder absent the offending portion."). For example, under *Blakely* the judge may still sentence a defendant in the aggravated range based upon the defendant's admission to an aggravating factor enumerated in N.C.G.S. § 15A-1340.16(d).

We emphasize that *Blakely*, which is grounded in the Sixth Amendment right to jury trial, affects only those portions of the Structured Sentencing Act which require the sentencing judge to consider the existence of aggravating factors not admitted to by a defendant or found by a jury and which permit the judge to impose an aggravated sentence after finding such aggravating factors by a preponderance of the evidence. Those portions of N.C.G.S. § 15A-1340.16 which govern a sentencing judge's finding of mitigating factors and which permit the judge to balance aggravating and mitigating factors otherwise found to exist are not implicated by *Blakely* and remain unaffected by our decision in this case.

COURT OF APPEALS OPINION BELOW

Having identified error in defendant's sentence, this Court must now determine whether that error is subject to harmless error review, and if so, whether harmless error exists in this case. The Court of Appeals concluded that the harmless-error rule does not apply, citing *State v. Ahearn*, 307 N.C. 584, 300 S.E.2d 689, which held that a defendant's case must be remanded for resentencing whenever the trial judge has imposed an aggravated sentence based upon a sentencing factor which is not supported by the evidence. *Allen*, 166 N.C. App. at 149-50, 601 S.E.2d at 306. The State argues, and we agree, that *Ahearn* is not controlling.

In *State v. Ahearn*, this Court considered the effect of one aggravating factor, which was later determined to be unsupported by the evidence, on a sentencing judge's balancing of all sentencing factors present in the case. 307 N.C. at 599-602, 300 S.E.2d at 698-701. The

defendant in *Ahearn* was convicted of felonious child abuse and voluntary manslaughter in connection with the death of his girlfriend's two-year old son. *Id.* at 585-87, 300 S.E.2d at 690-91. During sentencing, the trial judge found three aggravating factors and five mitigating factors. *Id.* at 592-93, 300 S.E.2d at 694-95. The judge weighed the aggravating and mitigating factors, determined that " 'the aggravating factors although few in number are substantially more dominant than the mitigating factors,' " and imposed aggravated sentences of sixteen years for voluntary manslaughter and five years for felonious child abuse. *Id.* at 585, 592, 300 S.E.2d at 690-91, 694. On appeal, the Court of Appeals and this Court determined that the trial judge's finding of the aggravating factor that the defendant's crime was especially heinous, atrocious or cruel was based upon insufficient evidence. *Id.* at 599, 300 S.E.2d at 698. Because "[r]eliance on a factor in aggravation determined to be erroneous may or may not have affected the balancing process which resulted in the decision to deviate from the presumptive sentence," this Court remanded the defendant's case for resentencing. *Id.* at 602, 608, 300 S.E.2d at 700, 704.

This Court's holding in *Ahearn* rested on the inability of an appellate court to determine how removing one aggravating factor would affect the sentencing judge's balancing of the remaining aggravating and mitigating factors present in the defendant's case. *Id.* at 602, 300 S.E.2d at 700-01. *Ahearn* did not address whether the finding of an aggravating factor by the wrong entity is subject to harmless error review. Because *Blakely* does not concern the actual combination of aggravating and mitigating factors found by a jury, but instead safeguards the participation of jurors in sentencing, *Ahearn* does not control the case *sub judice*. Our analysis of this separate question is guided by the reasoning of *Blakely v. Washington*, the evolution of harmless error review, and United States Supreme Court case law defining structural error.

## STRUCTURAL ERROR

The State argues that for purposes of *Apprendi* and *Blakely*, sentencing factors are functionally equivalent to the elements of a criminal offense. Citing *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35 (1999), the State reasons that failure to submit sentencing factors to a jury should receive the same degree of scrutiny as failure to submit an element of a criminal offense to the jury—harmless error review. We disagree, concluding instead that complete removal of aggravating factors from jury consideration during sentencing is structural error similar to the structural error identified by the United

States Supreme Court in *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182 (1993).

Structural error is a rare form of constitutional error resulting from a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 337 (1991). Such errors "deprive defendants of 'basic protections,' without which . . . 'no criminal punishment may be regarded as fundamentally fair.' *Neder*, 527 U.S. at 8-9, 144 L. Ed. 2d at 46-47 (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 92 L. Ed. 2d 460, 470 (1986)). The United States Supreme Court first defined structural error in 1991 and has identified six instances of structural error to date: (1) complete deprivation of right to counsel, *Johnson v. United States*, 520 U.S. 461, 468, 137 L. Ed. 2d 718, 728 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799 (1963)); (2) a biased trial judge, *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749 (1927); (3) the unlawful exclusion of grand jurors of the defendant's race, *Vasquez v. Hillery*, 474 U.S. 254, 88 L. Ed. 2d 598 (1986); (4) denial of the right to self-representation, *McKaskle v. Wiggins*, 465 U.S. 168, 79 L. Ed. 2d 122 (1984); (5) denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 81 L. Ed. 2d 31 (1984); and (6) constitutionally deficient jury instructions on reasonable doubt, *Sullivan*, 508 U.S. 275, 124 L. Ed. 2d 182. *See Johnson*, 520 U.S. at 468-69, 137 L. Ed. 2d at 728 (identifying the six cases in which the United States Supreme Court has found structural error).

Structural errors are said to "defy" harmless error review because they are "so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome." *Neder*, 527 U.S. at 7, 144 L. Ed. 2d at 46. For this reason, a defendant's remedy for structural error is not dependant upon harmless error analysis; rather, structural errors are reversible *per se. Id.*

Most constitutional errors are not structural. *Rose*, 478 U.S. at 578, 92 L. Ed. 2d at 471. On appeal, a reviewing court applies the harmless-error rule to determine whether these nonstructural errors were prejudicial to the defendant or harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11 (1967). Errors that have prejudiced a defendant will be remedied by the appellate court, *id.* at 24, 26, 17 L. Ed. 2d at 710-11; N.C.G.S. § 15A-1442, -1443, -1447 (2003), and a constitutional error is presumed to be prejudicial unless the State can show that the error

was harmless beyond a reasonable doubt, meaning that "the error complained of did not contribute to the verdict obtained," *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 710.

Since the United States Supreme Court first introduced harmless error review in 1946, that Court has employed one of two tests to determine whether an error "contribute[d] to the verdict obtained." *Id.* First, the Court has considered the "impact of the thing done wrong on the minds of [the jury]." *Kotteakos v. United States*, 328 U.S. 750, 764, 90 L. Ed. 1557, 1566 (1946). The Court applied this test, which evaluates the "effect [the error] had upon the guilty verdict in the case at hand," in *Sullivan v. Louisiana*, 508 U.S. at 279, 280-82, 124 L. Ed. 2d at 189, 190-91. Second, the United States Supreme Court has applied harmless error review after determining that evidence of the defendant's guilt presented at trial was "overwhelming." *Harrington v. California*, 395 U.S. 250, 254, 23 L. Ed. 2d 284, 287-88 (1969). The Court applied the "overwhelming" evidence standard in *Neder v. United States*, 527 U.S. at 16-17, 144 L. Ed. 2d at 51-52.

*Sullivan*, in which the United States Supreme Court found structural error, and *Neder*, in which the Court found error to be harmless beyond a reasonable doubt, guide this Court's decision in the case *sub judice*. Both *Sullivan* and *Neder* address the proper appellate court response to constitutional errors made during the guilt-innocence portion of a trial. The United States Supreme Court has not defined which standard, harmless or structural error, should be applied to state sentencing errors pursuant to *Blakely*; however, the imposition of a constitutional punishment is just as important to a criminal defendant and to society as is a constitutional determination of the defendant's guilt or innocence.

In *Sullivan v. Louisiana*, the United States Supreme Court considered whether harmless error review applied to constitutionally deficient jury instructions on reasonable doubt, which were submitted to the jury in a defendant's first-degree murder trial. 508 U.S. at 276-77, 124 L. Ed. 2d at 187. Except for the testimony of one eyewitness (who identified the defendant on direct examination, but was unable to identify either the defendant or his accomplice during a physical lineup), the State's evidence at trial was circumstantial. *Id.* at 276, 124 L. Ed. 2d at 187. Although defense counsel contended during closing argument that reasonable doubt existed as to whether the defendant was the shooter, the defendant was convicted of first-degree murder. *Id.* at 276-77, 124 L. Ed. 2d at 187. On appeal, the State

conceded that the trial judge had improperly defined "reasonable doubt" while instructing the jury, but argued that the error was harmless. *Id.* at 277, 124 L. Ed. 2d at 187.

Applying the "effect on the jury" standard, the United States Supreme Court considered "the basis on which 'the jury *actually rested* its verdict.' " *Id.* at 279-80, 124 L. Ed. 2d at 189-90. Because the jury had not returned a "verdict of guilty-beyond-a-reasonable-doubt," the Court reasoned that the harmless-error inquiry "whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." *Id.* at 280, 124 L. Ed. 2d at 189-90. The Court explained that there was "no *object*, so to speak, upon which harmless-error scrutiny can operate." *Id.* at 280, 124 L. Ed. 2d at 190. Stating that consequences of the defective verdict were "necessarily unquantifiable and indeterminate," the Court declared the error to be "structural" and remanded the defendant's case for further proceedings not inconsistent with its opinion. *Id.* at 281-82, 124 L. Ed. 2d at 191.

Six years later in *Neder v. United States*, the United States Supreme Court affirmed the conviction of a defendant who filed a false tax return even though the trial court erred in refusing to submit to the jury the question of whether defendant's false statements were material. 527 U.S. at 6, 25, 144 L. Ed. 2d at 45, 57. The Court found that harmless error is the proper standard of review when a single element of a criminal offense is omitted from the jury instructions. *Id.* at 15, 144 L. Ed. 2d at 51.

In *Neder*, the United States Supreme Court noted that evidence of the materiality of the defendant's false statements was "overwhelming." *Id.* at 16-17, 144 L. Ed. 2d at 52. In fact, the defendant did not even argue at trial that his false statements could be found immaterial. *Id.* at 16, 144 L. Ed. 2d at 51-52. Because the question of materiality was not in dispute at trial, the jury considered "all of the evidence and argument in respect to [the defendant's] defense against the tax charges," notwithstanding the trial judge's failure to instruct on that element of the offense. *Id.* at 9, 144 L. Ed. 2d at 47. Moreover, the defendant's guilt or innocence was "tried before an impartial judge, under the correct standard of proof and with the assistance of counsel." *Id.* On these facts, the United States Supreme Court reasoned that "an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* Distinguishing *Sullivan*, the United States Supreme Court empha-

sized that omission of one element, materiality, from the jury instructions cannot be said to "vitiate[] *all* the jury's findings," *id.* at 11, 144 L. Ed. 2d at 48; thus, the Court concluded that the harmless-error rule applied and remanded the defendant's case for a determination of whether the instructional error was, in fact, harmless. *Id.* at 25, 144 L. Ed. 2d at 57.

**[4]** The United States Supreme Court has made clear that the Sixth Amendment requires aggravating sentencing factors, like elements, to be found by a jury beyond a reasonable doubt. *Blakely*, —— U.S. at ——, ——, 159 L. Ed. 2d at 413-14, 420.[5] However, under North Carolina's current structured sentencing scheme, aggravating factors are *completely withheld* from jury review and are determined by a judge by a preponderance of the evidence. N.C.G.S. § 15A-1340.16. No impartial jury considers a defendant's evidence, arguments, and defenses during sentencing, *id.*, even when the aggravating factors advanced by the State are highly subjective in nature or disputed by the defendant. Moreover, aggravating factors are found to exist by a low standard of proof: a preponderance of the evidence. *Id.*; *see In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375 (1970) (" 'There is always in litigation a margin of error, representing error in factfinding,' " which the beyond a reasonable doubt standard is designed to " 'reduce.' ") (quoting *Speiser v. Randall*, 357 U.S. 513, 525, 2 L. Ed. 2d 1460, 1472 (1958)). For these reasons, we cannot agree with the State that the logic of *Neder* applies to defendant's case. Because, as in *Sullivan*, the jury's findings have been vitiated in total, the harmless-error rule does not apply. We hold that *Blakely* errors arising under North Carolina's Structured Sentencing Act are structural and, therefore, reversible *per se.*

This conclusion is supported by the strong language of *Blakely* itself. Writing for the majority, Justice Scalia explained that *Blakely* "reflects . . . the need to give intelligible content to the right of jury trial." 542 U.S. at ——, 159 L. Ed. 2d at 415. Justice Scalia emphasized that the Sixth Amendment right to jury trial is

> *no mere procedural formality, but a fundamental reservation of power in our constitutional structure.* Just as suffrage ensures the people's ultimate control in the legislative and exec-

---

5. As stated above, this condition applies only when the defendant is sentenced beyond the statutory maximum defined by *Blakely* and does not implicate facts to which a defendant has admitted or the fact of a prior conviction. For purposes of structured sentencing in North Carolina, the statutory maximum is the highest presumptive sentence imposed pursuant to N.C.G.S. §§ 15A-1340.16 and -1340.17.

utive branches, jury trial is meant to ensure their control in the judiciary.

*Id.* at ——, 159 L. Ed. 2d at 415 (emphasis added).[6]

Moreover, the Sixth Amendment expressly secures the participation of an impartial jury in all criminal prosecutions; thus, a trial judge is prohibited from entering a judgment of conviction or directing a guilty verdict against a defendant *"regardless of how overwhelmingly* the evidence may point in that direction." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73, 51 L. Ed. 2d 642, 652 (1977) (emphasis added); *see also Rose*, 478 U.S. at 578, 92 L. Ed. 2d at 471 ("[H]armless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury."). The error resulting from a directed verdict is that "the wrong entity judged the defendant guilty." *Rose*, 478 U.S. at 578, 92 L. Ed. 2d at 471; *see also State v. Staley*, 292 N.C. 160, 169-70, 232 S.E.2d 680, 686 (1977) (" 'In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused . . . for ascertainment of guilt by a jury.' ") (quoting *Bollenbach v. United States*, 326 U.S. 607, 615, 90 L. Ed. 350, 356 (1946)). Without trial by jury, the "strong . . . barrier . . . between the liberties of the people and the prerogative of the crown" is compromised. 4 William Blackstone, *Commentaries* *349.

Through *Apprendi* and *Blakely*, the United States Supreme Court has extended the Sixth Amendment right to jury trial to mandatory fact-finding proceedings which result in a criminal sentence above the statutory maximum. When a trial judge, not an impartial jury,

---

6. Interestingly, this language underpinning the United States Supreme Court's holding in *Blakely* is strikingly similar in tone and content to Justice Scalia's dissent in *Neder*, in which Justice Scalia describes the right to jury trial as the "spinal column of American democracy." *Neder*, 527 U.S. at 30, 144 L. Ed. 2d at 60 (Scalia, J., dissenting). In that dissent, Justice Scalia strongly disagreed with the logic and constitutional soundness of applying an "overwhelming evidence" harmless error standard to the defendant's conviction, arguing that no matter how great the evidence against a criminal defendant, he is entitled to the benefit of certain basic constitutional rights including the right to counsel, the right to an impartial judge, and the right "to have the jury determine his guilt of the crime charged." *Id.* at 30-34, 144 L. Ed. 2d at 60-62. Justice Scalia concluded, "The very premise of structural-error review is that even convictions reflecting the 'right' result are reversed for the sake of protecting a basic right." *Id.* at 34, 144 L. Ed. 2d at 62. Similarly, writing for the majority in *Crawford v. Washington*, Justice Scalia recently stated that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." 541 U.S. 36, 62, 158 L. Ed. 2d 177, 199 (2004).

finds the existence of all aggravating factors, the resulting sentence shares the same defect as a directed verdict on the defendant's guilt or innocence. "[T]he wrong entity has judged the defendant guilty." *Rose*, 478 U.S. at 578, 92 L. Ed. 2d at 471.

In *United States v. Booker*, the United States Supreme Court considered the constitutionality of the Federal Sentencing Guidelines with respect to *Apprendi* and *Blakely*. —— U.S. ——, 160 L. Ed. 2d 621 (2005). The Court determined that "the Sixth Amendment as construed in *Blakely* does apply to the Sentencing Guidelines," but the Court created a statutory remedy for the violation by invalidating 18 U.S.C. § 3553(b)(1), a section of the Sentencing Reform Act of 1984 which made " 'the [Federal Sentencing Guidelines] . . . mandatory and impose[d] binding requirements on all sentencing judges.' " *Id.* at ——, 160 L. Ed. 2d at 639, 659. Determining that one additional statutory provision was inseparable from section 3553(b)(1), the Court also severed this provision from the Sentencing Reform Act. *Id.* at ——, 160 L. Ed. 2d at 659-60. Because federal trial judges were no longer obligated to adhere to Federal Sentencing Guidelines during sentencing, the Court reasoned that *Blakely* did not apply to the remaining Sentencing Reform Act provisions. *Id.* at ——, 160 L. Ed. 2d at 643, 659 ("[E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the [Federal Sentencing] Guidelines binding on district judges."). In conclusion, the Court acknowledged,

> Ours, of course, is not the last word: The ball now lies in Congress' court. The National Legislature is equipped to devise and install, long-term, the sentencing system, compatible with the Constitution, that Congress judges best for the federal system of justice.

*Id.* at ——, 160 L. Ed. 2d at 663.

We recognize that dicta in Justice Breyer's "remedial" opinion in *Booker* suggests that lower federal courts may "apply ordinary prudential doctrines," such as plain and harmless error, when a defendant challenges on direct review a sentence imposed under the Federal Sentencing Guidelines, *id.* at ——, 160 L. Ed. 2d at 665; however, we conclude from context that Justice Breyer's comment refers to appellate review of *statutory error*, which results when a sentencing judge applies the Federal Sentencing Guidelines as mandatory, rather than advisory as required by the Court's severability holding.

STATE v. ALLEN

[359 N.C. 425 (2005)]

*Constitutional error* arising from a Sixth Amendment violation is not the subject of Justice Breyer's remark. For these reasons, *Booker* does not control the standard of review applied by North Carolina appellate courts to constitutional *Blakely* errors arising under North Carolina's Structured Sentencing Act.

Our interpretation is supported by the parallel structure of *Booker* itself, through which constitutional error and statutory error are identified in two separate majority opinions. Justice Stevens' majority opinion identifies constitutional error, concluding that "the Sixth Amendment as construed in *Blakely* does apply to the [Federal] Sentencing Guidelines." *Id.* at ——, 160 L. Ed. 2d at 639. Justice Breyer's separate majority opinion, which contains the dicta in question, identifies statutory error, concluding that "two provisions of the Sentencing Reform Act of 1984 (SRA) that have the effect of making the Guidelines mandatory must be invalidated in order to allow the statute to operate in a manner consistent with congressional intent." *Id.* at ——, 160 L. Ed. 2d at 639. Justice Breyer's suggestion that "application of the harmless-error doctrine" may determine "whether resentencing is warranted" is expressly limited to *"cases not involving a Sixth Amendment violation." Id.* at ——, 160 L. Ed. 2d at 665 (emphasis added). Thus, the United States Supreme Court has not yet established a remedy for Sixth Amendment *Blakely* error in the state courts.

This Court is not the first state supreme court to order resentencing in response to *Blakely* error.[7] Most recently, in *State v.*

7. However, until this Court's decision in *Allen* today, no two state supreme courts have resolved *Blakely* issues in the same manner. *See People v. Black*, 35 Cal.4th 1238, 1244, 113 P.3d 534, 536 (2005) (concluding that "the judicial fact finding that occurs when a judge exercises discretion to impose an upper term sentence under California law does not implicate a defendant's *Sixth Amendment* right to a jury trial"); *Lopez v. Colorado*, 113 P.3d 713, 726, 730, 2005 Colo. LEXIS 504 at **41-42, 55 (Colo. May 23, 2005) (stating "we need not find [Colorado's aggravated sentencing statute] is unconstitutional because aggravated sentences can be based on *Blakely*-compliant or *Blakely*-exempt facts," and concluding that the facts in the case *sub judice* were *Blakely* compliant); *Smylie v. State*, 823 N.E.2d 679, 685-86 (Ind. 2005) (severing only those "minimal portions" of Indiana's sentencing system, which mandated a fixed term and permitted judicial discretion in finding aggravating or mitigating circumstances to deviate from the fixed term, from the statute and holding that "the sort of facts envisioned by *Blakely* as necessitating a jury finding must be found by a jury under Indiana's existing sentencing laws"); *State v. Dilts*, 337 Or. 645, 654-56, 103 P.3d 95, 100-01 (2004) (holding that the Oregon sentencing guidelines are not facially unconstitutional; thus severability is inapplicable, and remanding to the trial court for implementation of the sentencing guidelines consistent with *Blakely*); *State v. Gomez*, 163 S.E.3d 632, 648, 661, 2005 Tenn. LEXIS 350 at **1, 49-50, 66 (Tenn. Apr. 15, 2005) (applying plain error review in determining that Tennessee's statutory sen-

STATE v. ALLEN

[359 N.C. 425 (2005)]

*Hughes*, the Supreme Court of Washington held that *Blakely* sentencing errors are structural errors. *State v. Hughes*, 154 Wash. 2d 118, 110 P.3d 192 (2005). That court based its holding on an exhaustive review of the harmless error doctrine, noting that many harmless error proponents misconstrue *United States v. Cotton*, 535 U.S. 625, 152 L. Ed. 2d 860 (2002), which applied plain, not harmless, error to *Apprendi* violations. *Id.* at 145, 110 P.3d at 206 *5. The Washington Supreme Court further observed that, at present, the federal circuits "appear inconsistent in whether they will apply harmless error analysis to *Apprendi/Blakely* violations." *Id.* at *9 147, 110 P.3d at 207.

Distinguishing *Neder*, the court stated,

Although *Neder* involved the situation where a jury did not find facts supporting every element of the crime, it still returned a guilty verdict. Like traditional harmless error analysis cases, the reviewing court could ask whether but for the omission in the jury instruction, the jury would have returned the same verdict. Where *Blakely* violations are at issue, however, the jury necessarily did not return a special verdict or explicit findings on the aggravating factors supporting the exceptional sentence. The reviewing court asks whether but for the error, the jury would have made different or new findings. This situation is analogous to *Sullivan*—there is no basis upon which to conduct a harmless error analysis.

*Id.* at *1 148, 110 P.3d at 207-08. Because "speculat[ion] on what juries would have done if they had been asked to find different facts" is impermissible, the Washington Supreme Court concluded, as do we, that "[h]armless error analysis cannot be conducted on *Blakely* Sixth Amendment violations." *Id.*

CONCLUSION

Although this Court might envision several measures which would cure the constitutional defect present in N.C.G.S. § 15A-1340.16, we are in agreement that the choice of remedy is properly within the province of the General Assembly. "The punish-

tencing procedures do not violate *Blakely*, in spite of the State's concession that such violations had occurred, because the Tennessee Criminal Sentencing Reform Act of 1989 is " 'an indeterminate,' non-mandatory, advisory sentencing scheme which merely requires judges to consider enhancement factors, along with other information, when exercising their discretion to select an appropriate sentence within the statutory range").

ment to be inflicted for any crime is left entirely to the General Assembly." *State v. Lytle*, 138 N.C. 738, 743, 51 S.E. 66, 68 (1905). And this Court has " 'absolutely no authority to control or supervise the power vested by the Constitution in the General Assembly as a coordinate branch of the government.' " *State v. Smith*, 352 N.C. 531, 553, 532 S.E.2d 773, 787 (2000) (quoting *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 503, 115 S.E. 336, 339 (1922), *quoted in In re Alamance Cty. Court Facils.*, 329 N.C. 84, 95, 405 S.E.2d 125, 130 (1991)), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001).

Having identified the source and nature of the constitutional defect present in N.C.G.S. § 15A-1340.16, we refrain from unwarranted interference in the legislative revision of North Carolina's structured sentencing scheme. In so doing, we note that the General Assembly has mandated that the North Carolina Sentencing and Policy Advisory Commission "study the North Carolina Structured Sentencing Act in light of the United States Supreme Court's decision in *Blakely*" and "report its findings and recommendations, including any proposed legislation, to the 2005 General Assembly upon its convening." The Studies Act of 2004, ch. 161, sec. 44.1, 2004 N.C. Sess. Laws 161, 195. The Commission submitted its report, including draft legislation, to the General Assembly in January 2005. N.C. Sentencing & Policy Advisory Comm'n, *Rep. on Study of Structured Sentencing Act in Light of Blakely v. Washington Pursuant to Sess. Law 2004-161, Sec. 44.1* (2005). On 21 June 2005 the General Assembly ratified An Act to Amend State Law Regarding the Determination of the Aggravating Factors in a Criminal Case to Conform with the United States Supreme Court Decision in *Blakely v. Washington*. H. 822, 146th Gen. Assem., 2005 Sess. (N.C. 2005) (ratified), *available at* http://www.ncga.state.nc.us/Sessions/2005/Bills/House/HTML/H822v3.html. This legislation was submitted to the Governor for his signature on 22 June 2005. *Id.*

For the reasons stated above, we deny defendant's motion for appropriate relief filed in this Court 8 February 2005. We affirm the decision of the Court of Appeals remanding defendant's case for resentencing and hold that, to the extent N.C.G.S. § 15A-1340.16 (a), (b), and (c) require trial judges to find aggravating factors by a preponderance of the evidence section 15A-1340.16 violates *Blakely*. We further hold that the harmless-error rule does not apply to sentencing errors which violate a defendant's Sixth Amendment right to jury trial pursuant to *Blakely*. Such errors are structural and, therefore, reversible *per se*.

STATE v. ALLEN

[359 N.C. 425 (2005)]

As stated at the outset, these holdings apply to cases "in which the defendants have not been indicted as of the certification date of this opinion and to cases that are now pending on direct review or are not yet final." *Lucas*, 353 N.C. at 598, 548 S.E.2d at 732; *see Hinnant*, 351 N.C. 277, 523 S.E.2d 663; *Griffith*, 479 U.S. 314, 93 L. Ed. 2d 649. Accordingly, we modify and affirm the decision of the Court of Appeals and remand defendant's case to that Court for further remand to Gaston County Superior Court for imposition of a sentence consistent with this opinion.

MODIFIED AND AFFIRMED.

## Figure 1
## N.C.G.S. § 1340.17(c) (2003)

PRIOR RECORD LEVEL

| | I 0 Pts | II 1-4 Pts | III 5-8 Pts | IV 9-14 Pts | V 15-18 Pts | VI 19+ Pts | DISPOSITION |
|---|---|---|---|---|---|---|---|
| A | Life Imprisonment Without Parole or Death as Established by Statute | | | | | | |
| | A | A | A | A | A | A | DISPOSITION |
| | 240-300 | 288-360 | 336-420 | 384-480 | Life Imprisonment Without Parole | | Aggravated |
| B1 | 192-240 | 230-288 | 269-336 | 307-384 | 346-433 | 384-480 | PRESUMPTIVE |
| | 144-192 | 173-230 | 202-269 | 230-307 | 260-346 | 288-384 | Mitigated |
| | A | A | A | A | A | A | DISPOSITION |
| | 157-196 | 189-237 | 220-276 | 251-313 | 282-353 | 313-392 | Aggravated |
| B2 | 125-157 | 151-189 | 176-220 | 201-251 | 225-282 | 251-313 | PRESUMPTIVE |
| | 94-125 | 114-151 | 132-176 | 151-201 | 169-225 | 188-251 | Mitigated |
| | A | A | A | A | A | A | DISPOSITION |
| | 73-92 | 100-125 | 116-145 | 133-167 | 151-188 | 168-210 | Aggravated |
| C | 58-73 | 80-100 | 93-116 | 107-133 | 121-151 | 135-168 | PRESUMPTIVE |
| | 44-58 | 60-80 | 70-93 | 80-107 | 90-121 | 101-135 | Mitigated |
| | A | A | A | A | A | A | DISPOSITION |
| | 64-80 | 77-95 | 103-129 | 117-146 | 133-167 | 146-183 | Aggravated |
| D | 51-64 | 61-77 | 82-103 | 94-117 | 107-133 | 117-146 | PRESUMPTIVE |
| | 38-51 | 46-61 | 61-82 | 71-94 | 80-107 | 88-117 | Mitigated |
| | I/A | I/A | A | A | A | A | DISPOSITION |
| | 25-31 | 29-26 | 34-42 | 46-58 | 53-66 | 59-74 | Aggravated |
| E | 20-25 | 23-29 | 27-34 | 37-46 | 42-53 | 47-59 | PRESUMTIVE |
| | 15-20 | 17-23 | 20-27 | 28-37 | 32-42 | 35-47 | Mitigated |
| | I/A | I/A | I/A | A | A | A | DISPOSITION |
| | 16-20 | 19-24 | 21-26 | 25-31 | 34-42 | 39-49 | Aggravated |
| F | 13-16 | 15-19 | 17-21 | 20-25 | 27-34 | 31-39 | PRESUMPTIVE |
| | 10-13 | 11-15 | 13-17 | 15-20 | 20-27 | 23-31 | Mitigated |
| | I/A | I/A | I/A | I/A | A | A | DISPOSITION |
| | 13-16 | 15-19 | 16-20 | 20-25 | 21-26 | 29-36 | Aggravated |
| G | 10-13 | 12-15 | 13-16 | 16-20 | 17-21 | 23-29 | PRESUMPTIVE |
| | 8-10 | 9-12 | 10-13 | 12-16 | 13-17 | 17-23 | Mitigated |
| | CI/A | I/A | I/A | I/A | I/A | A | DISPOSITION |
| | 6-8 | 8-10 | 10-12 | 11-14 | 15-19 | 20-25 | Aggravated |
| H | 5-6 | 6-8 | 8-10 | 9-11 | 12-15 | 16-20 | PRESUMPTIVE |
| | 4-5 | 4-6 | 6-8 | 7-9 | 9-12 | 12-16 | Mitigated |
| | C | C/I | I | I/A | I/A | I/A | DISPOSTION |
| | 6-8 | 6-8 | 6-8 | 8-10 | 9-11 | 10-12 | Aggravated |
| I | 4-6 | 4-6 | 5-6 | 6-8 | 7-9 | 8-10 | PRESUMPTIVE |
| | 3-4 | 3-4 | 4-5 | 4-6 | 5-7 | 6-8 | Mitigated |

**STATE v. ALLEN**

[359 N.C. 425 (2005)]

# Figure 2
## N.C.G.S. § 15A-1340.17 (d), (e) (2003)

(d) Maximum Sentences Specified for Class F through Class I Felonies.—Unless provided otherwise in a statute establishing a punishment for a specific crime, for each minimum term of imprisonment in the chart in subsection (c) of this section, expressed in months, the corresponding maximum term of imprisonment, also expressed in months, is as specified in the table below for Class F through Class I felonies. The first figure in each cell in the table is the minimum term and the second is the maximum term.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3-4 | 4-5 | 5-6 | 6-8 | 7-9 | 8-10 | 9-11 | 10-12 |
| 11-14 | 12-15 | 13-16 | 14-17 | 15-18 | 16-20 | 17-21 | 18-22 |
| 19-23 | 20-24 | 21-26 | 22-27 | 23-28 | 24-29 | 25-30 | 26-32 |
| 27-33 | 28-34 | 29-35 | 30-36 | 31-38 | 32-39 | 33-40 | 34-41 |
| 35-42 | 36-44 | 37-45 | 38-46 | 39-47 | 40-48 | 41-50 | 42-51 |
| 43-52 | 44-53 | 45-54 | 46-56 | 47-57 | 48-58 | 49-59 | |

(e) Maximim Sentences Specified for Class B1 through Class E Felonies for Minimum Terms up to 339 Months.—Unless provided otherwise in a statute establishing a punishment for a specific crime, for each minimum term of imprisonment in the chart in subsection (c) of this section, expressed in months, the corresponding maximum term of imprisonment, also expressed in months, is as specified in the table below for Class B1 through Class E felonies. The first figure in each cell of the table is the minimum term and the second in the maximum term

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 15-27 | 16-29 | 17-30 | 18-31 | 19-32 | 20-33 | 21-35 | 22-36 |
| 23-37 | 24-38 | 25-39 | 26-41 | 27-42 | 28-43 | 29-44 | 30-45 |
| 31-47 | 32-48 | 33-49 | 34-50 | 35-51 | 36-53 | 37-54 | 38-55 |
| 39-56 | 40-57 | 41-59 | 42-60 | 43-61 | 44-62 | 45-63 | 46-65 |
| 47-66 | 48-67 | 49-68 | 50-69 | 51-71 | 52-72 | 53-73 | 54-74 |
| 55-75 | 56-77 | 57-78 | 58-79 | 59-80 | 60-81 | 61-83 | 62-84 |
| 63-85 | 64-86 | 65-87 | 66-89 | 67-90 | 68-91 | 69-92 | 70-93 |
| 71-95 | 72-96 | 73-97 | 74-98 | 75-99 | 76-101 | 77-102 | 78-103 |
| 79-104 | 80-105 | 81-107 | 82-108 | 83-109 | 84-110 | 85-111 | 86-113 |
| 87-114 | 88-115 | 89-116 | 90-117 | 91-119 | 92-120 | 93-121 | 94-122 |
| 95-123 | 96-125 | 97-126 | 98-127 | 99-128 | 100-129 | 101-131 | 102-132 |
| 103-133 | 104-134 | 105-135 | 106-137 | 107-138 | 108-139 | 109-140 | 110-141 |
| 111-143 | 112-144 | 113-145 | 114-146 | 115-147 | 116-149 | 117-150 | 118-151 |
| 119-152 | 120-153 | 121-155 | 122-156 | 123-157 | 124-158 | 125-160 | 126-161 |
| 127-162 | 128-163 | 129-164 | 130-165 | 131-167 | 132-168 | 133-169 | 134-170 |
| 135-171 | 136-173 | 137-174 | 138-175 | 139-176 | 140-177 | 141-179 | 142-180 |
| 143-181 | 144-182 | 145-183 | 146-185 | 147-186 | 148-187 | 149-188 | 150-189 |
| 151-191 | 152-192 | 153-193 | 154-194 | 155-195 | 156-197 | 157-198 | 158-199 |
| 159-200 | 160-201 | 161-203 | 162-204 | 163-205 | 164-206 | 165-207 | 166-209 |
| 167-210 | 168-211 | 169-212 | 170-213 | 171-215 | 172-216 | 173-217 | 174-218 |
| 175-219 | 176-221 | 177-222 | 178-223 | 179-224 | 180-225 | 181-227 | 182-228 |
| 183-229 | 184-230 | 185-231 | 186-233 | 187-234 | 188-234 | 189-236 | 190-237 |
| 191-239 | 192-240 | 193-241 | 194-242 | 195-243 | 196-245 | 197-246 | 198-247 |
| 199-248 | 200-249 | 201-251 | 202-252 | 203-253 | 204-254 | 205-255 | 206-257 |
| 207-258 | 208-259 | 209-260 | 210-261 | 211-263 | 212-264 | 213-265 | 214-266 |
| 215-267 | 216-269 | 217-270 | 218-271 | 219-272 | 220-273 | 221-275 | 222-276 |
| 223-277 | 224-278 | 225-279 | 226-281 | 227-282 | 228-283 | 229-284 | 230-285 |
| 231-287 | 232-288 | 233-289 | 234-290 | 235-291 | 236-293 | 237-294 | 238-295 |
| 239-296 | 240-297 | 241-299 | 242-300 | 243-301 | 241-302 | 245-303 | 246-305 |
| 247-306 | 248-307 | 249-308 | 250-309 | 251-311 | 252-312 | 253-313 | 254-314 |
| 255-315 | 256-317 | 257-318 | 258-319 | 259-320 | 260-321 | 261-323 | 262-324 |
| 263-325 | 264-326 | 265-327 | 266-329 | 267-330 | 268-331 | 269-332 | 270-333 |
| 271-335 | 272-336 | 273-337 | 274-338 | 275-339 | 276-341 | 277-342 | 278-343 |
| 279-344 | 280-345 | 281-347 | 282-348 | 283-349 | 284-350 | 285-351 | 286-353 |
| 287-354 | 288-355 | 289-356 | 290-357 | 291-359 | 292-360 | 293-361 | 294-362 |
| 295-363 | 296-365 | 297-366 | 298-367 | 299-368 | 300-369 | 301-371 | 302-372 |
| 303-373 | 304-374 | 305-375 | 306-377 | 307-378 | 308-379 | 309-380 | 310-381 |
| 311-383 | 312-384 | 313-385 | 314-386 | 315-387 | 316-380 | 317-390 | 318-391 |
| 319-392 | 320-393 | 321-395 | 322-396 | 323-397 | 324-398 | 325-399 | 326-401 |
| 327-402 | 328-403 | 329-404 | 330-405 | 331-407 | 332-408 | 333-409 | 334-410 |
| 335-411 | 336-413 | 337-414 | 338-415 | 339-416 | | | |

(e1) Maximum Sentences Specified for Class B1 through Class E Felonies for Minimum Terms of 340 Months or More.—Unless provided otherwise in a statute establishing a punishment for a specific crime, when the minimum sentence is 340 months or more, the corresponding maximum term of imprisonment shall be equal to the sum of the minimum term of imprisonment and twenty percent (20%) of the minimum term of imprisonment, rounded to the next highest month, plus nine additional months. (1993, c. 538, s. 1; 1994, Ex. Sess., c. 14, ss 20, 21; c. 22, s. 7; c. 24, s. 14(b); 1995, c. 507, s. 19.5(l); 1997-80, s.3.)

Justice MARTIN, concurring in part and dissenting in part.

The issue of whether *Blakely* errors are subject to harmless-error analysis is governed by federal law. *See Connecticut v. Johnson*, 460 U.S. 73, 81 n.9, 74 L. Ed. 2d 823, 830 n.9 (1983) (stating that "whether a federal constitutional error can be harmless is a federal question"). Accordingly, this Court should follow controlling precedents of the United States Supreme Court to hold that *Blakely* errors, like most other errors that may occur during a state criminal trial, should be analyzed for harmlessness on direct review. Nonetheless, because the *Blakely* error in the present case is not harmless beyond a reasonable doubt, I agree that defendant's case should be remanded for a new sentencing hearing at which a jury determines whether the offense in question was "especially heinous, atrocious, or cruel."

I.

To fully appreciate the importance of the harmless-error doctrine in American criminal jurisprudence, it is necessary to understand the historical evolution of the doctrine. Harmless-error review first appeared in Anglo-American jurisprudence with the passage of England's Judicature Act of 1873, which sought to mitigate the excesses of that country's Exchequer Rule. Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 27.6(a), at 1160 (2d ed. 1992) [hereinafter LaFave & Israel, *Criminal Procedure*]. Over the course of the nineteenth century, the Exchequer Rule had evolved into a rule of nearly automatic reversal of convictions for even the most technical trial errors. *Id.* Recognizing the inefficiency and impracticability of such a rule, the Judicature Act instructed appellate courts "to look to the actual impact of the error upon the outcome of the proceeding, and not simply . . . assume that every error . . . was per se prejudicial." *Id.*

Throughout the late nineteenth and early twentieth centuries, American courts lagged behind their English counterparts and continued to apply—and even expand—a version of England's Exchequer Rule. *Id.*; Roger J. Traynor, *The Riddle of Harmless Error* 13 (1970) [hereinafter Traynor, *Harmless Error*]. Numerous cases were decided on the basis of trivial technical errors, and pointless new trials with predetermined outcomes became a staple of the criminal law. Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. Rev. 1167, 1174 (1995) (noting that without harmless-error review, numerous cases were decided on the basis of trivial technical errors).

Eventually, the harmless-error doctrine took root in America, born "out of widespread and deep [public concern] over the general course of appellate review in . . . criminal causes." *Kotteakos v. United States*, 328 U.S. 750, 759, 90 L. Ed. 1557, 1563 (1946). In response to this perception, the federal government and all fifty states adopted some form of statutory harmless-error rule by the mid-1960s. LaFave & Israel, *Criminal Procedure* § 27.6, at 1161; Traynor, *Harmless Error*, at 14. North Carolina adopted its statutory harmless-error rule for civil cases in 1967, and its corresponding rule for criminal cases in 1977. N.C.G.S. § 1A-1, Rule 61 (2003) (civil), N.C.G.S. § 15A-1443 (2003) (criminal).

For many years, it was presumed that harmless-error analysis could not be applied to constitutional errors. *Johnson*, 460 U.S. at 82, 74 L. Ed. 2d at 831 (plurality opinion). In *Chapman v. California*, however, the United States Supreme Court held that a federal constitutional error could be harmless, provided an appellate court could "declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11 (1967); *cf.* N.C.G.S. § 15A-1443(b) (2003) (providing that constitutional error "is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt"). Following *Chapman*, as the majority notes, the United States Supreme Court appeared to apply two "tests" for analyzing whether a constitutional error was harmless. *See, e.g.,* Jeffrey O. Cooper, *Searching for Harmlessness: Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine*, 50 Kan. L. Rev. 309, 311-12 (2002) [hereinafter Cooper, *Searching for Harmlessness*]. Under one test, most recently applied in *Sullivan v. Louisiana*, an appellate court is to focus on the "effect [the error] had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189 (1993). As articulated in *Sullivan*, this test asks "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* Under the other test, most recently articulated in *Neder v. United States*, an appellate court is to engage in a counter-factual inquiry, asking whether, in light of all the evidence properly presented at trial, it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18, 144 L. Ed. 2d 35, 53 (1999); *see also Harrington v. California*, 395 U.S. 250, 254, 23 L. Ed. 2d 284, 287-88 (1969). In

applying this standard, a court must consider, in part, whether the jury verdict was supported by "overwhelming evidence, such that the jury verdict would have been the same" had the error not occurred. *Neder*, 527 U.S. at 17, 144 L. Ed. 2d at 52.

The majority treats these two distinct approaches to harmless-error analysis as equally viable alternatives between which this Court may freely choose. In *Neder*, however, the United States Supreme Court expressly rejected the *Sullivan* test in favor of the counter-factual "overwhelming evidence" formulation for constitutional harmless-error analysis. *Id.* at 17, 144 L. Ed. 2d at 52. Specifically, the Court rejected the defendant's argument that *Sullivan* precluded a court applying harmless-error analysis from considering "overwhelming record evidence of [his] guilt," stating that the "proper mode of analysis" was to ask whether it was "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 17-18, 144 L. Ed. 2d at 52-53. There is, therefore, only *one* test at this juncture to determine whether a federal constitutional error is harmless—the test set forth in *Neder*.

## II.

Now an anchor of our appellate jurisprudence, harmless-error review effectuates several important public policies. First, the doctrine conserves judicial resources by preventing costly, time-consuming, and unnecessary new trials. *See Chapman*, 386 U.S. at 22, 17 L. Ed. 2d at 709 (stating that the doctrine "block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial"); Traynor, *Harmless Error*, at 14. Second, it promotes public confidence in the criminal justice system by reducing the risk that guilty defendants may go free. *See Johnson v. United States*, 520 U.S. 461, 470, 137 L. Ed. 2d 718, 729 (1997) (" 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' " (quoting Traynor, *Harmless Error*, at 50); *Arizona v. Fulminante*, 499 U.S. 279, 308, 113 L. Ed. 2d 302, 330 (1991) (stating that the doctrine " 'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error' "). Third, it reduces delays in the criminal process resulting from unnecessary remands, thus promoting the constitutional right to a "speedy trial." Traynor, *Harmless Error*, at 51. Fourth, it promotes fundamental fairness in criminal proceedings by helping to ensure that criminal cases are decided on the merits, and not on

the basis of minor technical defects that have no bearing on guilt or innocence. *See,* *e.g., Fulminante,* 499 U.S. at 308, 113 L. Ed. 2d at 330 (stating that "the harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence' "). And fifth, it promotes stability in the criminal law by reducing the risk that judges may bend or adapt substantive and procedural rules in order to avoid unwarranted reversals. *See* Cooper, *Searching for Harmlessness,* at 314.

The majority correctly notes that the right to jury trial in criminal cases is "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely v. Washington,* —— U.S. ——, ——, 159 L. Ed. 2d 403, 415 (2004). It " 'was designed "to guard against a spirit of oppression and tyranny on the part of rulers," and "was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties." ' " *Neder,* 527 U.S. at 19, 144 L. Ed. 2d at 53 (quoting *United States v. Gaudin,* 515 U.S. 506, 510-11, 132 L. Ed. 2d 444, 450 (1995)). I agree wholeheartedly with this description of the vital role played by the jury in our constitutional system of government. Nonetheless, deciding whether a particular type of Sixth Amendment violation may be reviewed for harmlessness requires courts to strike a "balance between 'society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made.' " *Id.* at 18, 144 L. Ed. 2d at 53 (quoting *Connecticut v. Johnson,* 460 U.S. at 86, 74 L. Ed. 2d at 834 (plurality opinion) (alterations in original)). In *Neder v. United States,* for example, the United States Supreme Court conducted just such a balancing of interests, concluding that when a trial court erroneously fails to instruct the jury on an essential element of the crime, harmless-error review "does not fundamentally undermine the purposes of the jury trial guarantee." *Id.* at 19, 144 L. Ed. 2d at 53. The Court concluded that when an appellate court can readily discern from a "thorough examination of the record" that a jury would surely have found the fact in question based on the evidence presented at trial, "holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.' " *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 577, 92 L. Ed. 2d 460, 470 (1986) (alteration in original)).

### III.

But determining whether a particular type of constitutional error is subject to harmless-error analysis is not simply a matter of balancing interests or assessing the importance of any particular constitu-

**STATE v. ALLEN**

[359 N.C. 425 (2005)]

tional provision. All constitutional rights are important; none should be denied or abridged. Yet the United States Supreme Court has recognized that those constitutional errors that defy harmless-error review "are the exception and not the rule," *Rose v. Clark*, 478 U.S. at 578, 92 L. Ed. 2d at 471, and that "most constitutional errors can be harmless," *Arizona v. Fulminante*, 499 U.S. at 306, 113 L. Ed. 2d at 329. Significantly, the Supreme Court has declared that if a criminal defendant is represented by competent counsel before an impartial judge, there is a *"strong presumption"* that any error that occurs in the course of the trial is subject to harmless-error analysis. *Rose*, 478 U.S. at 579, 92 L. Ed. 2d at 471 (emphasis added). Indeed, even the majority in the present appeal concedes, as it must, that exceptions to harmless error review in federal constitutional law are "rare."

The test for determining whether an error may be reviewed for harmlessness is set forth in *Arizona v. Fulminante*. In *Fulminante*, the United States Supreme Court surveyed its prior cases in which constitutional errors *were* reviewed for harmlessness, concluding that "[t]he common thread connecting these cases is that each involved 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." 499 U.S. at 307-08, 113 L. Ed. 2d at 330. The *Fulminante* Court identified at least sixteen such "trial errors," including:

> unconstitutionally overbroad jury instructions at the sentencing stage of a capital case; admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause; jury instruction containing an erroneous conclusive presumption; jury instruction misstating an element of the offense; jury instruction containing an erroneous rebuttable presumption; erroneous exclusion of defendant's testimony regarding the circumstances of his confession; restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause; denial of a defendant's right to be present at trial; improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause; [a] statute improperly forbidding [the] trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause; failure to instruct the jury on the presumption of innocence; admission of identification evidence in violation of the Sixth Amendment

Confrontation Clause; admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Confrontation Clause; confession obtained in violation of *Massiah v. United States*; admission of evidence obtained in violation of the Fourth Amendment; [and] denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause.

*Id.* at 306-07, 113 L. Ed. 2d at 329-30 (citations and parentheses omitted).

In contrast, the limited class of cases in which harmless-error analysis does not apply involve rare "structural defects in the constitution of the trial mechanism" by which the "entire conduct of the trial from beginning to end [was] obviously affected." *Id.* at 309-10, 113 L. Ed. 2d at 331. As distinguished from mere "trial errors," each of these constitutional violations "is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 113 L. Ed. 2d at 331. To date, only six constitutional errors have been deemed "structural defects": (1) complete denial of the right to counsel, (2) denial of the right to an impartial judge, (3) racial discrimination in grand jury selection (4) denial of the right to self-representation at trial, (5) denial of the right to a public trial, and (6) defective reasonable-doubt instructions. *Neder*, 527 U.S. at 8, 144 L. Ed. 2d at 46.

On a theoretical level, there are at least three reasons why such "structural defects" require automatic reversal. First, in each of the examples listed above, a case-by-case assessment of harmlessness would be grossly inefficient because it "is so likely" that any particular error had a prejudicial effect in any individual case "that case-by-case inquiry into prejudice is not worth the cost." *Strickland v. Washington*, 466 U.S. 668, 692, 80 L. Ed. 2d 674, 696 (1984). Second, the effect of each of these errors on the outcome of the trial is inherently "unquantifiable and indeterminate," such that an appellate court could not readily discern from the record whether any individual error caused actual prejudice. *Sullivan*, 508 U.S. at 282, 124 L. Ed. 2d at 191. Finally, and most importantly, when any of these constitutional rights are denied, " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Fulminante*, 499 U.S. at 310, 113 L. Ed. 2d at 331 (quoting *Rose*, 478 U.S. at 577-78, 92 L. Ed. 2d at 470 (citation omitted)).

STATE v. ALLEN

[359 N.C. 425 (2005)]

Together, these reasons inform the federal constitutional rule that so long as a criminal defendant was represented by counsel before an impartial judge, there is a "strong presumption" that any other error is subject to harmless-error analysis. *Rose*, 478 U.S. at 579, 92 L. Ed. 2d at 471. When a criminal defendant is tried without counsel or before a biased judge, it is almost impossible to gauge the effect of the error on the outcome of the trial, and the likelihood of prejudice is so high that a rule of automatic reversal is more efficient than a case-by-case inquiry into harmlessness. *Id.* at 577-79, 92 L. Ed. 2d at 470-71. But when a defendant is competently represented before an impartial tribunal, the adversarial process will generally provide a record from which an appellate court can adequately gauge the prejudicial effect of any errors. *Id.* at 579-80, 92 L. Ed. 2d at 471-72 (noting that unconstitutional burden-shifting, unlike the denial of counsel or judicial bias, does not affect composition of the record and thus is amenable to harmless-error review). Under such circumstances, appellate review will adequately ensure that criminal convictions are factually accurate and that criminal punishments are fundamentally fair. *Id.* at 579, 92 L. Ed. 2d at 471 ("Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.").

Applying these principles, it is clear that *Blakely* error is more analogous to the larger class of "trial errors" than it is to the limited class of "structural defects." First, it can hardly be said that a judge "is so likely" to find facts a jury would not find that "case-by-case inquiry" into harmlessness "is not worth the cost." *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696. Although there may be individual cases in which a judge finds facts a jury would not, there is no reason to presume that such a discrepancy would be so common that harmless-error review is inefficient as a general rule.[8] To the contrary, it can be expected that in most cases, a rational jury will reach the

_____

8. Of course, any fact-finder—judge or jury—is more likely to find a given sentencing factor when applying the "preponderance" standard than when applying the "beyond a reasonable doubt" standard as required by *Blakely*. But there is no empirical evidence to suggest that it is "so likely" that *Blakely* violations result in sentencing enhancements that would not otherwise be found that "case-by-case inquiry" into harmlessness "is not worth the cost." *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696. Nor is there any reason to presume that appellate courts would, as a general matter, have difficulty reviewing the record evidence under a more stringent, *Blakely*-compliant burden of proof. After all, careful application of the correct standard of review is a hallmark of appellate adjudication. *See* 5 Am. Jur. 2d *Appellate Review* § 559 (1995) (stating that "the standard of review is the keystone of appellate decisionmaking").

same factual determinations as a rational judge, based on the evidence presented and arguments of adversarial counsel. As the United States Supreme Court stated in *Schriro v. Summerlin*, a case decided the same day as *Blakely*, it is "implausible" to suggest "that judicial factfinding so 'seriously diminishe[s]' accuracy as to produce an ' "impermissibly large risk" ' of injustice." *Schriro v. Summerlin*, —— U.S. ——, ——, 159 L. Ed. 2d 442, 451 (2004) (alteration in original) (citation omitted). Second, the effect of a *Blakely* error is not inherently "unquantifiable and indeterminate," *Sullivan*, 508 U.S. at 282, 124 L. Ed. 2d at 191, as an appellate court can ordinarily discern from the record whether the evidence against the defendant was so "overwhelming" and "uncontroverted" that any rational fact-finder would have found the disputed aggravating factors beyond a reasonable doubt, *Neder*, 527 U.S. at 9, 18, 144 L. Ed. 2d at 47, 53. Third, when an appellate court can readily determine that a jury would have found an aggravating factor beyond a reasonable doubt, the criminal process has served its primary function " 'as a vehicle for determination of guilt or innocence,' " and the punishment imposed in light of the aggravating factors must be considered " 'fundamentally fair.' " *Fulminante*, 499 U.S. at 310, 113 L. Ed. 2d at 331 (citations omitted).

## IV.

The foregoing analysis demonstrates that application of the harmless-error doctrine to *Blakely* errors comports with the theoretical contours of that doctrine. But determining whether *Blakely* error is a "trial error" or a "structural defect" does not depend entirely on the application of presumptions, policy considerations, or abstract principles. Rather, clearly established precedent of the United States Supreme Court mandates the inescapable conclusion that *Blakely* errors are "trial errors" subject to harmless-error review.

In *Neder v. United States*, the United States Supreme Court held that the trial court's unconstitutional failure to submit an essential element of the crime to the jury was subject to harmless-error analysis. 527 U.S. at 4, 144 L. Ed. 2d at 44. Although the omission of the element from the jury instructions impermissibly "infringe[d] upon the jury's factfinding role" in violation of the Sixth Amendment's jury trial guarantee, *id.* at 18, 144 L. Ed. 2d at 52, the Court held that the error was not a "structural" one that *"necessarily* render[ed] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 9, 144 L. Ed. 2d at 47. Accordingly, the Court reviewed the Sixth Amendment violation in Neder's case for harmlessness. *Id.* at 15-20, 144 L. Ed. 2d at 51-53. The Court con-

cluded "that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Id.* at 17, 144 L. Ed. 2d at 52. Thus, the Court concluded, the constitutional error was "properly found to be harmless." *Id.* at 17, 144 L. Ed. 2d at 52.

Admittedly, the instant case deals with the failure to submit an *aggravating factor*, as opposed to an *essential element*, for jury determination. But this distinction provides no viable basis for distinguishing *Neder*, as the *Blakely* line of cases[9] firmly establishes the principle that aggravating factors are the "functional equivalent" of essential elements of the crime for purposes of the Sixth Amendment right to jury trial. *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19, 147 L. Ed. 2d 435, 457 n.19 (2000) ("[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent* of an element of a greater offense than the one covered by the jury's guilty verdict.") (emphasis added); *see also Blakely*, —— U.S. at ——, 159 L. Ed. 2d at 415-16; *Ring v. Arizona*, 536 U.S. 584, 602, 153 L. Ed. 2d 556, 572 (2002). *Neder*, therefore, is controlling here, and *Blakely* errors are subject to harmless-error analysis.[10]

---

9. What is now referred to as the *Blakely* rule had its genesis in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), was first articulated in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000), and has been applied in *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556 (2002) and *United States v. Booker*, —— U.S. ——, 160 L. Ed. 2d 621 (2005). Succinctly stated, the *Blakely* rule provides that a criminal defendant has a constitutional "right to have the jury find the existence of ' "any particular fact" ' that the law makes essential to his punishment." *Booker*, —— U.S. at ——, 160 L. Ed. 2d at 642 (citing *Apprendi, Ring*, and *Blakely* (internal citations omitted)); *see also Blakely*, —— U.S. at ——, 159 L. Ed. 2d at 420 ("As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment."). In examining a criminal sentence for a *Blakely* violation, the dispositive question "is one not of form, but of effect." *Apprendi*, 530 U.S. at 494, 147 L. Ed. 2d at 457. Thus, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—*no matter how the State labels it*—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 153 L. Ed. 2d at 572 (emphasis added); *see also Blakely*, —— U.S. at ——, 159 L. Ed. 2d at 415 (rejecting the argument that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge").

10. This application of *Neder* may be summarized by the following syllogism: (1) Under *Neder*, the failure to submit an essential element of the crime to the jury, though violative of the Sixth Amendment right to jury trial, is subject to harmless-error analysis; (2) The *Blakely* line of cases establishes that aggravating factors are the "functional equivalent" of essential elements for purposes of the right to jury trial; (3) Therefore, the failure to submit an aggravating factor for jury determination is also subject to harmless-error inquiry. At least three of the appellate courts to have directly

The majority contends that *Sullivan v. Louisiana,* rather than *Neder,* controls our disposition of the harmless-error issue. I acknowledge that there is language in *Sullivan* that appears to support the majority's position. But subsequent decisions of the United States Supreme Court establish that the holding of *Sullivan* is more limited than some of its language suggests, and that *Neder,* not *Sullivan,* is dispositive here.

In *Sullivan,* the United States Supreme Court held that the trial court's defective reasonable-doubt instruction was a "structural defect" not subject to harmless-error inquiry. 508 U.S. at 281-82, 124 L. Ed. 2d at 190-91. The Court emphasized that the trial court's "misdescription of the burden of proof" had "vitiate[d] *all* the jury's findings," such that a proper jury verdict "was never in fact rendered." *Id.* at 279, 281, 124 L. Ed. 2d at 189, 190. Because there was no jury finding of guilty-beyond-a-reasonable-doubt of *any* fact essential to the defendant's punishment, an appellate court could "only engage in pure speculation" as to "what a reasonable jury would have done." *Id.* at 281, 124 L. Ed. 2d at 190. Under such circumstances, the Court concluded, "to hypothesize [on appellate review] a guilty verdict that was never in fact rendered . . . would violate the jury-trial guarantee." *Id.* at 279, 124 L. Ed. 2d at 189.

In the instant case, the majority reasons that harmless-error analysis does not apply to *Blakely* errors "[b]ecause, as in *Sullivan,* the jury's findings have been vitiated in total," as "aggravating factors are *completely withdrawn* from jury review" by our structured sentencing system. This analysis, however, misapprehends the holding of *Sullivan,* ignores subsequent opinions clarifying that holding, and essentially recapitulates an argument expressly rejected by the United States Supreme Court in *Neder.*

The defendant in *Neder* cited *Sullivan* in support of his argument that the failure to submit *one essential element* of the crime for

considered application of the harmless-error doctrine to *Blakely* errors have followed this reasoning in holding that *Blakely* errors may be reviewed for harmlessness. *See, e.g., State v. Henderson,* 209 Ariz. 300, ——, 100 P.3d 911, 917-21 (Ct. App. 2004), *disc. rev. granted in part,* 2005 Ariz. LEXIS 36 (Mar. 23, 2005) (No. 1 CA-CR 03-0920); *State v. McDonald,* 136 N.M. 417, ——, 99 P.3d 667, 669-70 (2004); *State v. Walters,* 2004 WL 2726034, at **22-24 (Tenn. Crim. App. Nov. 30, 2004) (No. M2003-03019-CCA-R3CD) (unpublished). If there is a flaw in this rather straight-forward analysis, I would expect the majority to shed some light on it. But nowhere in its opinion does the majority respond directly to this argument, which is clearly and forcefully articulated in the state's brief. Rather, the majority summarily "disagree[s]" with the state's argument before embarking on its own independent analysis of the question presented.

jury determination was not subject to harmless-error review. *Neder*, 527 U.S. at 11, 144 L. Ed. 2d at 48. Specifically, the defendant argued that "where the constitutional error . . . prevents the jury from rendering a 'complete verdict' on *every* element of the offense. . . . the basis for harmless-error review' " is simply absent." ' " *Id.* (quoting Brief for Petitioner at 7). The United States Supreme Court rejected this argument and distinguished *Sullivan*, stating that "the absence of a 'complete verdict' on every element of the offense" establishes a violation of the Sixth Amendment right to jury trial, but does not address "whether the error is subject to harmless-error analysis." *Id.* at 12, 144 L. Ed. 2d at 49. Although it acknowledged that it "would not be illogical to extend the reasoning of *Sullivan* . . . to a failure to instruct on an element of the crime," the Court declined to "veer away from settled precedent to reach such a result." *Id.* at 15, 144 L. Ed. 2d at 50-51.

In *Mitchell v. Esparza*, the Court further clarified the jurisprudential relationship between *Sullivan* and *Neder*. The Court explained that in *Neder* it "explicitly distinguished *Sullivan* because the error in *Sullivan*—the failure to instruct the jury that the State must prove the elements of an offense beyond a reasonable doubt— ' "vitiate[d] *all* the jury's findings," ' whereas, the trial court's failure to instruct the jury on one element of an offense did not." *Mitchell v. Esparza*, 540 U.S. 12, 16, 157 L. Ed. 2d 263, 270 (2003) (per curiam) (citations omitted). Thus, in *Neder*, "[w]here the jury was precluded from determining only one element of an offense, [the Court] held that harmless-error review is feasible." *Id.*

In light of *Mitchell*, it is clear that *Neder*, not *Sullivan*, controls with respect to the application of harmless-error doctrine to *Blakely* errors. Here, as in *Neder*, the constitutional error consisted in the *partial* infringement of the right to jury trial. Like the constitutional error in *Neder*, the failure to submit one aggravating factor to the jury for determination did not "vitiate[] *all* the jury's findings," and thus does not constitute a structural defect requiring automatic reversal under *Sullivan. Sullivan*, 508 U.S. at 281, 124 L. Ed. 2d at 190.

By unanimous jury verdict, the defendant in the instant case was convicted of felonious child abuse inflicting serious bodily injury[11]

---

11. "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death, or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." N.C.G.S. § 14-318.4(a3) (2003).

under N.C.G.S. § 14-318.4. Thus, the following essential elements were necessarily found by a jury beyond a reasonable doubt: (1) that defendant was a "parent or any other person providing care to or supervision of [the victim]," (2) that the victim was a "child less than 16 years of age" at the time of the assault, (3) that the defendant "inflict[ed] serious bodily injury" on the child, and (4) that the defendant did so "intentionally." N.C.G.S. § 14-318.4(a3) (2003). It makes no sense to maintain that these jury findings were "vitiated in total" by the trial court's failure to submit the one aggravating factor in this case for jury determination. Although that failure undoubtedly infringed upon defendant's Sixth Amendment right to jury trial, four of the five facts essential to the punishment he received (the four elements of the crime) *were* found by a jury beyond a reasonable doubt. Like the defendant in *Neder*, the defendant in the instant case "was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel," and "a fairly selected, impartial jury was instructed to consider all of the evidence and argument in respect to [his] defense" against the charges presented. 527 U.S. at 9, 144 L. Ed. 2d at 47. Thus, as in *Neder*, the unconstitutional failure to submit one factual issue to the jury—in this case, the aggravating factor—"did not render [the defendant's] trial 'fundamentally unfair.' " *Id.*

As a general matter, a defendant alleging *Blakely* error has ordinarily received a jury trial in which a jury found most of the facts essential to punishment—the designated "elements" of the crime. As the Arizona Court of Appeals aptly stated in a recent opinion, "*Blakely* error is much more akin to the error in *Neder* than the error in *Sullivan*," because a defendant alleging *Blakely* error "has already had a trial in which a jury has determined beyond a reasonable doubt that he or she is guilty." *State v. Henderson*, 209 Ariz. 300, ——, 100 P.3d 911, 920 (Ct. App. 2004) (relying on *Mitchell* in holding that *Neder*, not *Sullivan*, applies to *Blakely* errors). *Blakely* error is "closer to failing to properly instruct on *one element* of an offense (which casts doubt on that one element) than it is to failing to properly instruct on the burden of proof as to *every element* of the offense (which casts doubt on the entire verdict)." *Id.* Accordingly, the failure to submit an aggravating factor for jury determination, like the failure to submit an essential element for jury determination, is subject to harmless-error review.[12]

---

12. This analysis is entirely consistent with the United States Supreme Court's decision in *Rose v. Clark*, 478 U.S. 570, 92 L. Ed. 2d 460 (1986), which is cited several times by the majority. In *Rose*, the Court stated that when the Sixth Amendment right

V.

The majority's reluctance to apply the harmless-error doctrine to *Blakely* errors, apparently born out of a healthy respect for the role of the jury, is understandable but ultimately misguided. First, contrary to the majority's opinion, the application of harmless-error principles to *Blakely* errors does not constitute impermissible "speculation" as to what a jury might have done. To be sure, "any time an appellate court conducts harmless-error review it necessarily engages in some speculation as to the jury's decisionmaking process; for in the end no judge can know for certain what factors led to the jury's verdict." *Sullivan*, 508 U.S. at 284, 124 L. Ed. 2d at 192 (Rehnquist, C.J., concurring). But this "speculation" is restrained by rigorous judicial standards and an exacting burden of proof: an appellate court reviewing for harmless error must "conduct a thorough examination of the record" to determine whether a constitutional error was harmless "beyond a reasonable doubt." *Neder*, 527 U.S. at 19, 144 L. Ed. 2d at 53. If the reviewing court "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the [factual determination at issue] and raised evidence sufficient to support a contrary finding—it should not find the error harmless." *Id.*

Second, neither *Blakely* error itself nor the application of the harmless-error doctrine to *Blakely* errors presents, in the majority's words, "the same defect as a directed verdict on the defendant's guilt or innocence." It is well settled that a trial court may not direct a verdict against a criminal defendant, " 'regardless of how overwhelming[] the evidence' " against him, and that such an error may not be reviewed for harmlessness. *Rose*, 478 U.S. at 578, 92 L. Ed. 2d at 471 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73, 51 L. Ed. 2d 642, 652 (1977)). As the United States Supreme Court explained in *Rose*, when the right to a jury trial is "altogether denied, the State cannot contend that the deprivation was harmless

---

to jury trial is "*altogether denied*, the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty." 478 U.S. at 578, 92 L. Ed. 2d at 471 (emphasis added). As noted above, however, in a typical *Blakely* case, the jury has already determined most, if not all, of the facts essential to punishment. Hence, the Sixth Amendment right to jury trial has not been "altogether" denied, and harmless-error analysis is presumptively applicable under *Rose* itself. *See id.* at 579, 92 L. Ed. 2d at 471 (discussing the "strong presumption" that a federal constitutional error is subject to harmless-error analysis).

because . . . the error in such a case is that the wrong entity judged the defendant guilty." *Id.* Thus, the Sixth Amendment does not permit a judge to completely usurp the role of the jury by directing a verdict for the state. *Id.* As the United States Supreme Court later clarified in *Neder*, however, the *partial* deprivation of the right to jury trial does *not* implicate the rule set out in *Rose* and *is* subject to harmless-error analysis. *Neder*, 527 U.S. at 17 n.2, 144 L. Ed. 2d at 52 n.2. Because *Blakely* errors, like *Neder* errors, do not involve total deprivation of the right to a jury trial, they are *not* tantamount to directed verdicts for the state.

Nor is the application of harmless-error review particularly problematic in the context of *Blakely* errors. In *Neder*, the United States Supreme Court noted that an appellate court's application of harmless-error review does not implicate the same Sixth Amendment concerns as a trial judge's usurpation of the jury's role in the first instance. *Id.* at 17, 144 L. Ed. 2d at 52 (rejecting the defendant's argument that application of harmless-error analysis to the trial court's erroneous reasonable-doubt instruction would "dispense with trial by jury and allow judges to direct a guilty verdict"). The Court explained that a court applying the harmless-error doctrine does not " 'become in effect a second jury to determine whether the defendant is guilty.' " *Id.* at 19, 144 L. Ed. 2d at 53 (quoting Traynor, *Harmless Error*, at 21); *cf. Smith v. Dixon*, 14 F.3d 956, 978 (4th Cir.) ("No authority relied on by [the defendant] supplies support for the proposition that harmless-error analysis involves a weighing of factual evidence that this court is not authorized to conduct."), *cert. denied*, 513 U.S. 841, 130 L. Ed. 2d 72 (1994). Rather, an appellate court, "in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the [factual determination at issue]. If the answer to that question is 'no,' holding the error harmless does not 'reflect a denigration of the constitutional rights involved.' " *Neder*, 527 U.S. at 19, 144 L. Ed. 2d at 53 (quoting *Rose*, 478 U.S. at 577, 92 L. Ed. 2d at 470). In short, when an appellate court engages in harmless-error review, it does not unconstitutionally usurp the role of the jury or otherwise undermine the spirit of the Sixth Amendment.

## VI.

The majority relies heavily on *State v. Hughes*, —— Wash. 2d ——, 110 P.3d 192 (2005), a recent case in which the Washington Supreme Court held that *Blakely* errors are not subject to harmless-

error review. As noted in the majority's opinion, the *Hughes* court relied on *Sullivan* to reach its holding that *Blakely* errors cannot be reviewed for harmlessness. *Hughes*, —— Wash. 2d at ——, 110 P.3d at ——. Specifically, *Hughes* relied on *Sullivan's* reasoning that harmless-error review cannot be applied to any constitutional error that prevents the jury from returning a verdict of guilty-beyond-a-reasonable-doubt, since the inquiry " 'whether the *same* verdict of guilty-beyond-a-reasonable doubt would have been rendered absent the constitutional error is utterly meaningless.' " *Id.* at ——, 110 P.3d at —— (quoting *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189-90). Quoting extensively from *Sullivan*, the *Hughes* court further stated that the " 'illogic' " of applying harmless-error analysis in the absence of an " 'actual finding of guilty beyond a reasonable doubt' " was evident: " '[t]here is no *object*, so to speak, upon which harmless-error scrutiny can operate.' " *Id.* at ——, 110 P.3d at —— (quoting *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189-90). Applying these principles, the court concluded that it would be equally "illogical" to apply the harmless-error doctrine to *Blakely* errors. *Id.* at ——, 110 P.3d at ——.

Admittedly, the above-quoted language from *Sullivan* lends logical support for the *Hughes* court's holding on the harmless-error issue. That language, however, was *specifically disavowed* in *Neder*. In *Neder*, the United States Supreme Court unequivocally stated that this "strand of the reasoning in *Sullivan* . . . cannot be squared with [the Court's] harmless-error cases." 527 U.S. at 11, 144 L. Ed. 2d at 48. Noting that the Court had previously applied harmless-error review in at least three cases "where the jury did not render a 'complete verdict' on every element of the offense," the Court repudiated the "alternative reasoning" in *Sullivan* that precludes application of harmless-error analysis where there has not been an "*actual*" jury verdict on every element of the crime. *Id.* at 11-13, 144 L. Ed. 2d at 48-49. It is now settled, under *Neder*, that a *partial deprivation* of the right to jury trial *may* be reviewed for harmlessness. *Id.* at 8-9, 144 L. Ed. 2d at 46-47; *see also id.* at 36, 144 L. Ed. 2d at 64 (Scalia, J., dissenting) (accusing the majority of "casting *Sullivan* aside"). And *Sullivan* has been limited to its primary rationale: that defective reasonable-doubt instructions cannot be reviewed for harmlessness because they "vitiate[] *all* the jury's findings." *Sullivan*, 508 U.S. at 281, 124 L. Ed. 2d at 190.

Perhaps for this reason, *Hughes* appears to be an outlier among appellate court decisions addressing the *Blakely*/harmless-error issue. My research reveals that the majority of courts to have

STATE v. ALLEN

[359 N.C. 425 (2005)]

considered this issue have agreed that *Blakely* errors *are* subject to harmless-error review.[13]

Moreover, in *United States v. Cotton*, the United States Supreme Court expressly rejected the argument that unpreserved *Apprendi* errors are "structural errors" requiring automatic reversal.[14] *United*

---

13. *See United States v. Riccardi*, 405 F.3d 852, 875 (10th Cir. 2005) (concluding that Sixth Amendment *Blakely/Booker* error was harmless in light of "overwhelming" evidence supporting the sentencing judge's fact-finding); *United States v. Paz*, 405 F.3d 946 (11th Cir. 2005) (per curiam) (applying harmless-error doctrine to *Blakely* error); *United States v. Ameline*, 400 F.3d 646, 652 (9th Cir.) (noting that under *Booker* "not all cases would warrant a new sentencing hearing because any error might be harmless"), *vacated and reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005); *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005) (stating that *Booker* challenge was "governed by the harmless error standard appropriate for constitutional error"); *United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005) (describing *Blakely* and *Booker* error as a "prototypical example of harmless error" where defendant received a "statutory mandatory minimum" sentence); *United States v. Pittman*, 388 F.3d 1104, 1109 (7th Cir. 2004) (analyzing *Blakely* claim for plain error and adding in dictum that the claim "would fall short under harmless error review as well"), *vacated on other grounds and cert. granted by* —— U.S. ——, 161 L. Ed. 2d 764 (2005); *United States v. Mincey*, 380 F.3d 102, 105 (2d Cir. 2004) (per curiam) (reviewing a "*Blakely*-type claim" for harmless error), *vacated and cert. granted by Ferrell v. United States*, —— U.S. ——, 160 L. Ed. 2d 1053 (2005); *State v. Henderson*, 209 Ariz. 300, ——, 100 P.3d 911, 920-22 (Ct. App. 2004) (holding that *Blakely* errors are subject to harmless-error analysis and citing other cases in support of that proposition), *disc. rev. granted in part*, 2005 Ariz. LEXIS 36 (Mar. 23, 2005) (No. 1 CA-CR-03-0920); *State v. Martinez*, 209 Ariz. 280, ——, 100 P.3d 30, 32 (Ct. App. 2004) ("Further, we hold that *Blakely* error is subject to harmless error or fundamental error analysis and may or may not require reversal based on the facts of a particular case."), *disc. rev. granted*, 2005 Ariz. LEXIS 16 (Feb. 8, 2005) (No. 1 CA-CR-03-0728); *People v. Amons*, 22 Cal. Rptr. 3d 908, 916-17, 125 Cal. App. 4th 855, 867-68 (Ct. App. 2005) (holding that *Blakely* errors are subject to harmless-error analysis and citing numerous cases), *disc. rev. denied*, 2005 Cal. LEXIS 4345 (Apr. 20, 2005) (No. A105374); *Padilla v. State*, 822 N.E.2d 288, 291 (Ind. Ct. App. 2005) (applying harmless error analysis to *Blakely* claim); *Holden v. State*, 815 N.E.2d 1049, 1059-60 (Ind. Ct. App. 2004) (applying harmless-error analysis to *Blakely* claim); *State v. Lowery*, 160 Ohio App. 3d 138, 154, 826 N.E.2d 340, 352-53 (2005) (applying harmless-error analysis to *Blakely* claim); *State v. Ginn*, 2005 Tenn. Crim. App. LEXIS 313, at **24, 32-33 (Mar. 31, 2005) (No. M2003-02330-CCA-R3-CD) (unpublished) (stating that *Blakely* error is subject to harmless-error review); *State v. Walters*, 2004 Tenn. Crim. App. LEXIS 1053, at *62 (Nov. 30, 2004) (No. M2003-03019-CCA-R3-CD) (unpublished) (holding that *Blakely* error is subject to harmless-error review), *appeal denied*, 2005 Tenn. LEXIS 264 (Mar. 21, 2005).

14. The Court in *Cotton* went on to apply harmless-error principles in the course of its plain-error review, noting that even though the grand jury's indictment did not allege the amount of drugs involved in the crimes charged, "[t]he evidence that the conspiracy involved at least 50 grams of cocaine base was 'overwhelming' and 'essentially uncontroverted.' " 535 U.S. at 633, 152 L. Ed. 2d at 869 (quoting *Johnson*, 520 U.S. at 470, 137 L. Ed. 2d at 729). In light of the overwhelming evidence presented at trial, the Court concluded that "[s]urely the grand jury, having found that the conspiracy existed, would have also found that the conspiracy involved at least 50 grams of cocaine base." *Id.* Admittedly, *Cotton* applied harmless-error principles to the *grand*

STATE v. ALLEN

[359 N.C. 425 (2005)]

*States v. Cotton*, 535 U.S. 625, 632-34, 152 L. Ed. 2d 860, 868-69 (2002). Similarly, every federal circuit, along with many state appellate courts, has held that *Apprendi* errors are subject to harmless-error review.[15] Given that *Blakely* was at most an *extension*, if not merely a *direct application* of *Apprendi*, *see Blakely v. Washington*, —— U.S. at ——, 159 L. Ed. 2d at 412, the only logical conclusion is that *Blakely* errors, like *Apprendi* errors, are also subject to both plain-

---

*jury's* failure to find facts belonging in an indictment. *Id.* It is not much of a stretch, however, to extend *Cotton* to the situation where a *petit jury* has not found facts essential to the punishment. *See State v. Sepahi*, 206 Ariz. 321, 324 n.3, 78 P.3d 732, 735 n.3 (2003) (relying on *Cotton* in determining that *Apprendi* error is subject to harmless-error review). *See generally* Joshua A.T. Fairfield, *To Err is Human: The Judicial Conundrum of Curing Apprendi Error*, 55 Baylor L. Rev. 889, 953 (2003) (following a discussion of *Cotton*, concluding that "in both the harmless error and plain error settings, there is no reason to treat the failure to present an element of a crime to a grand jury any differently than a failure to present an element of a crime to a petit jury").

15. *See, e.g., United States v. Higgs*, 353 F.3d 281, 304-06 (4th Cir. 2003), *cert. denied*, —— U.S. ——, 160 L. Ed. 2d 456 (2004); *United States v. Perez-Ruiz*, 353 F.3d 1, 17 (1st Cir. 2003), *cert. denied*, 541 U.S. 1005, 158 L. Ed. 2d 522 (2004); *United States v. Lafayette*, 337 F.3d 1043, 1052 (D.C. Cir. 2003); *United States v. Zidell*, 323 F.3d 412, 433-34 (6th. Cir.), *cert. denied*, 540 U.S. 824, 157 L. Ed. 2d 46 (2003); *United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002), *cert. denied*, 538 U.S. 938, 155 L. Ed. 2d 341 (2003); *United States v. Stewart*, 306 F.3d 295, 322-23 (6th Cir. 2002); *United States v. Friedman*, 300 F.3d 111, 127-28 (2d Cir. 2002), *cert. denied*, 538 U.S. 981, 155 L. Ed. 2d 672 (2003); *United States v. Samuel*, 296 F.3d 1169, 1171-72 (D.C. Cir.), *cert. denied*, 537 U.S. 1078, 154 L. Ed. 2d 578 (2002); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 670 (9th Cir.), *cert. denied*, 537 U.S. 939, 154 L. Ed. 2d 243 (2002); *United States v. Henry*, 282 F.3d 242, 251-52 (3d Cir. 2002); *United States v. Wheat*, 278 F.3d 722, 739-42 (8th Cir. 2001) (applying harmless-error principles in the context of plain-error review and concluding that "any *Apprendi* error is harmless"), *cert. denied*, 537 U.S. 850, 154 L. Ed. 2d 81 (2002); *United States v. Prentiss*, 273 F.3d 1277, 1278-79 (10th Cir. 2001); *United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001), *cert. denied*, 536 U.S. 963, 153 L. Ed. 2d 845 (2002); *United States v. Bailey*, 270 F.3d 83, 88-90 (1st Cir. 2001); *United States v. Candelario*, 240 F.3d 1300, 1307 (11th Cir.), *cert. denied*, 533 U.S. 922, 150 L. Ed. 2d 705 (2001), *overruled in part on other grounds by United States v. Sanchez*, 269 F.3d 1250, 1277-80 (11th Cir. 2001), *cert. denied*, 535 U.S. 942, 152 L. Ed. 2d 234 (2002); *United States v. Anderson*, 236 F.3d 427, 429 (8th Cir.), *cert. denied*, 534 U.S. 956, 151 L. Ed. 2d 270 (2001); *United States v. Nance*, 236 F.3d 820, 825 (7th Cir. 2000), *cert. denied*, 534 U.S. 832, 151 L. Ed. 2d 43 (2001); *United States v. Garcia-Guizar*, 234 F.3d 483, 488-89 (9th Cir. 2000), *cert. denied*, 532 U.S. 984, 149 L. Ed. 2d 490 (2001); *United States v. Nealy*, 232 F.3d 825, 829-30 (11th Cir. 2000), *cert. denied*, 534 U.S. 1023, 151 L. Ed. 2d 428 (2001); *State v. Garcia*, 200 Ariz. 471, 475, 28 P.3d 327, 331 (Ct. App. 2001); *People v. Sengpadychith*, 26 Cal. 4th 316, 327, 27 P.3d 739, 746 (2001); *State v. Davis*, 255 Conn. 782, 796 & n.14, 772 A.2d 559, 568 & n.14 (2001); *State v. Price*, 61 Conn. App. 417, 423-25, 767 A.2d 107, 112-13, *appeal denied*, 255 Conn. 947, 769 A.2d 64 (2001); *People v. Thurow*, 203 Ill. 2d 352, 368, 786 N.E.2d 1019, 1028 (2003); *State v. Burdick*, 2001 ME 143, ¶¶22-34, 782 A.2d 319, 326-29 (2001), *cert. denied*, 534 U.S. 1145, 151 L. Ed. 2d 998 (2002).

error and harmless-error review.[16] *See State v. Henderson*, 209 Ariz. at ——, 100 P.3d at 917.

## VII.

Although I disagree with the majority's reasoning, I agree with its ultimate disposition in this particular case: defendant is entitled to a new sentencing hearing in which a jury, not a judge, must make a factual determination as to whether the offense was "especially heinous, atrocious, or cruel." I reach this result because, applying the harmless-error standard of *Neder* to the facts presented, I conclude that the *Blakely* violation in the instant case was not harmless beyond a reasonable doubt.

As an initial matter, the somewhat subjective nature of the N.C.G.S. § 15A-1340.16(d)(7) "heinous, atrocious, or cruel" aggravating factor may, depending on the specific facts of each case, render application of the harmless-error standard problematic. Plainly, it is more difficult for an appellate court, reviewing a cold record, to determine beyond a reasonable doubt that a jury would have found an offense "especially heinous" than it is for an appellate court to determine that the defendant "knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person," N.C.G.S. § 15A-1340.16(d)(8) (2003), or "committed the offense while on pretrial release on another charge," N.C.G.S. § 15A-1340.16(d)(12). This is not to say, however, that a judicial finding that an offense was "heinous, atrocious, or cruel" can *never* be harmless beyond a reasonable doubt. Even in the context of capital sentencing proceedings, we have never held that the subjectivity of the "heinous, atrocious, or cruel" aggravator precluded appellate courts from considering whether the evidence was sufficient to support findings of that factor. *See, e.g., State v. Golphin*, 352 N.C. 364, 479-81, 533 S.E.2d 168, 242-43 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001);

---

16. *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556 (2002), a precursor to *Blakely* that applied the *Apprendi* rule in the context of capital sentencing, lends further support to this position. In a footnote in *Ring*, the United States Supreme Court declined to reach "the [s]tate's assertion that any error was harmless" because "this Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance." *Id.* at 609 n.7, 153 L. Ed. 2d at 577 n.7. If the Court did not agree that *Ring* (or *Apprendi*) errors were generally subject to harmless-error review, it would not have directed the lower federal courts to pass on such matters "in the first instance." In addition, the Arizona Supreme Court held on remand in *Ring III* that the failure to submit aggravating factors to the jury in capital cases was subject to harmless-error review. *State v. Ring*, 204 Ariz. 534, 65 P.3d 915, 933 (2003).

*State v. Huffstetler*, 312 N.C. 92, 115-16, 322 S.E.2d 110, 124-25 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985); *State v. Oliver*, 309 N.C. 326, 342-49, 307 S.E.2d 304, 316-20 (1983). Certainly in some cases the facts speak for themselves, such that no rational juror would fail to find the offense was "especially heinous, atrocious, or cruel." *Cf. State v. Perkins*, 345 N.C. 254, 288-89, 481 S.E.2d 25, 40-41 (defendant raped and murdered a seven-year-old girl in front of the girl's grandmother and three-year-old brother; no plain error in trial court's failure to give a limiting instruction on the "heinous, atrocious, or cruel" aggravator), *cert. denied*, 522 U.S. 837, 139 L. Ed. 2d 64 (1997). Indeed, this Court and the United States Court of Appeals for the Fourth Circuit have both previously applied harmless-error analysis to uphold the "heinous, atrocious, or cruel" aggravator in capital sentencing proceedings. *Smith v. Dixon*, 14 F.3d at 981 (holding that an unconstitutionally vague jury instruction on the "especially heinous, atrocious, or cruel" (e)(9) aggravator was harmless in light of the "overwhelming force of the evidence"); *State v. Burr*, 341 N.C. 263, 309, 461 S.E.2d 602, 627 (1995) ("Based on the overwhelming amount of evidence that the killing was especially heinous, atrocious, or cruel, assuming *arguendo* the admission of this statement was error, any such error was necessarily harmless beyond a reasonable doubt."), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996); *cf. State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001) (rejecting argument that counsel's admission of the (d)(7) aggravator rendered his performance deficient because "[g]iven the overwhelming evidence that this murder was especially heinous, atrocious, or cruel, counsel could reasonably have decided upon a strategy of conceding this aggravating circumstance to gain credibility with the jury"), *cert. denied*, 537 U.S. 846, 154 L. Ed. 2d 73 (2002). Accordingly, I believe that the "especially heinous, atrocious, or cruel" (d)(7) aggravator is, as a general proposition, subject to harmless-error review.

Reviewing this particular aggravating factor for harmlessness, however, I believe that the evidence presented was neither "uncontroverted" nor "overwhelming" and thus that the *Blakely* error in the instant case was not harmless *beyond a reasonable doubt*. First, the evidence presented by the state in support of its contention that defendant intentionally burned his child—the basis for the "heinous, atrocious, or cruel" aggravator—was far from "uncontroverted." There were no eyewitnesses to the events in question, and the state's evidence consisted mainly of testimony from a physician assistant that the burns did not appear to be accidental.

Defendant, however, strenuously maintained his innocence throughout his arrest, interrogation, and every stage of these proceedings.[17] A jury was certainly entitled to disregard defendant's testimony. But as we have often stated, issues of witness credibility are uniquely the province of the jury. *See, e.g., State v. Hyatt,* 355 N.C. 642, 666, 566 S.E.2d 61, 77 (2002), *cert. denied,* 537 U.S. 1133, 154 L. Ed. 2d 823 (2003).

Second, the state's evidence in support of the (d)(7) aggravator, while sufficient to sustain a guilty verdict, was far from "overwhelming." The evidence against the defendant consisted primarily of the testimony of Thomas McLaughlin, P.A. (McLaughlin), the physician assistant who treated the victim's burns. McLaughlin had approximately twenty-seven years of experience as a physician assistant and had worked at the hospital emergency room for six years. He did not possess a license to practice medicine or a medical degree. Although he had no specialized burn training, McLaughlin found that the child had either second- or third-degree burns on his hand, wrist, stomach, and knee. Based on the severity of the burns and his belief that a person would not hold on to a hot object long enough to cause burns that deep, McLaughlin opined that the burns were caused by someone holding an object against the child's skin. He also opined that the shapes of the burns were not consistent with a burn suffered from grabbing a curling iron. Because the burns were round and not linear in shape, McLaughlin concluded that they were most likely caused by a round object.

While this testimony certainly supports the inference that defendant intentionally inflicted multiple burns on his child—the factual predicate for the (d)(7) aggravator in this case—the evidence in support of that factor is far from "overwhelming." Had the *Blakely* error not occurred, a jury could certainly have decided to reject all or part of McLaughlin's testimony in light of (1) his relative inexperience with burns, (2) his lack of a medical degree or license to practice medicine, and (3) defendant's consistent and strenuous testimony that he did not harm the child. In addition, a jury could rationally have determined that defendant's bandaging of the child's hand suggested he was unaware of the other burns on the child's body and that he acted compassionately, not in an "especially heinous, atrocious, or cruel" manner.

---

17. Defendant did, however, accept responsibility for the accidental burning, acknowledging that if he had been more vigilant in watching the child, the injury would not have occurred.

Moreover, the "heinous, atrocious, or cruel" aggravator is complicated by the requirement that the offense be "*especially*" heinous, atrocious, or cruel. N.C.G.S. § 15A-1340.16(d)(7) (2003) (emphasis added). As we have previously explained, the aggravator applies only if "the facts of the case disclose *excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present in [the] offense.*" *State v. Blackwelder,* 309 N.C. 410, 414, 306 S.E.2d 783, 786 (1983). Because the offense of felonious child abuse inflicting serious injury *inherently* involves "brutality, . . . physical pain, . . . [and] dehumanizing aspects," it is particularly difficult to apply this standard in the instant case. Indeed, a comparison of this state's appellate precedents demonstrates that application of the *Blackwelder* standard often requires fine distinctions that do not readily lend themselves to harmless-error analysis. *See, e.g., State v. Ahearn,* 307 N.C. 584, 599, 300 S.E.2d 689, 698 (1983) (evidence that baby had been struck on at least three occasions, tied to his crib, and placed under a mattress factually supported defendant's guilty plea of felonious child abuse, but "f[ell] short of supporting a finding that the offense was especially heinous, atrocious or cruel"); *State v. Newton,* 82 N.C. App. 555, 560, 347 S.E.2d 81, 84-85 (1986) (defendant's repeatedly striking his wife in the presence of their child and refusal to get her medical attention supported his conviction for assault with a deadly weapon with intent to kill inflicting serious injury, but did not "represent brutality beyond that found in other [such] assaults"), *disc. rev. denied,* 318 N.C. 699, 351 S.E.2d 756 (1987).

Based upon the evidence of record, the (d)(7) aggravator could be found in the instant case by a rational jury applying the beyond-a-reasonable-doubt standard. However, on the facts presented here, I cannot conclude that this particular *Blakely* error was harmless beyond a reasonable doubt. Therefore, and on these grounds only, I agree that the instant case should be remanded to the Court of Appeals for further remand to the trial court with instructions to submit the (d)(7) aggravating factor for determination by a jury.

Although, undoubtedly, judicial fact-finding of aggravating factors violates the federal constitutional rule enunciated in *Blakely v. Washington,* United States Supreme Court precedent also compels application of the harmless-error doctrine to *Blakely* violations. I have no doubt that my colleagues in the majority are motivated by the noblest of intentions. Nevertheless, the majority's invocation of

STATE v. ALLEN

[359 N.C. 425 (2005)]

"structural error" to *Blakely* violations is erroneous under federal constitutional principles which govern *Blakely* violations.

Moreover, the public record reflects that 75 "*Blakely* cases" are now pending for disposition in our 15-member intermediate appellate court, the North Carolina Court of Appeals. To put this in perspective, the Court of Appeals has issued a total of 738 opinions so far in 2005. And the burden on our legal and judicial system does not end there. Each improvident "*Blakely* remand" to the trial court, in North Carolina and every other state, necessarily entails the application of additional prosecutorial, legal, and other "justice system" resources. Where the *Blakely* error in any such case is "harmless beyond a reasonable doubt," these resources are, in turn, potentially unavailable to redress prejudicial legal error.

With that said, I fully concur in our remand order based on the particular facts of the instant case. But taxing our already overburdened judicial and legal resources through indiscriminate application of a categorical rule accomplishes nothing from a practical perspective, elevates form over substance, and unnecessarily undermines the salutary objectives that are undeniably effectuated by application of harmless-error review. Accordingly, I dissent from the majority's holding that *Blakely* errors are categorically unamenable to harmless-error review. In all other respects, I concur in the majority opinion.

Chief Justice LAKE and Justice NEWBY join in this concurring and dissenting opinion.